1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RAYMOND THOMPKINS,                    Case No.  2:23-cv-0449-TLN-JDP (P)

12                    Petitioner,

13          v.                             FINDINGS AND RECOMMENDATIONS

14   LUIS MARTINEZ, *et al.*,

15                    Respondents.

16

17

18          Petitioner Raymond Thompkins, a state prisoner proceeding without counsel, seeks a writ

19   of habeas corpus under 28 U.S.C. § 2254, in which he contends that (1) his Sixth Amendment

20   right to confront witnesses against him was violated when the victims' videotaped statements

21   were introduced at trial; (2) he was vindictively prosecuted; (3) his appellate counsel was

22   ineffective in raising his vindictive prosecution claim before the state appellate court; and (4) his

23   trial counsel performed infectively by failing to object to expert testimony.  ECF No. 1.

24   Respondents have filed an answer, ECF No. 17, and petitioner has filed a traverse, ECF No. 20.

25   After reviewing the pleadings and state court records, I recommend that the petition be denied.

26

27

28

                                            1

1

**Background**

2

I have reviewed the background summary drafted by the state appellate court on habeas

3

review.  It is correct, and I reproduce it here:

4

> In 2017 Raymond Thompkins was tried for three crimes he was
> charged with committing in 2015 against three of his wife's young
> granddaughters, A.G., T.C., and J.G.  It was the third trial involving
> J.G., the first trial involving the other two.  Thompkins was
> convicted of the crimes against A.G. and T.C., but acquitted of that
> involving J.G.

5

6

7

> Thompkins appealed, and a lawyer from the panel of the First
> District Appellate Project (FDAP) was assigned to represent him.
> Counsel filed an opening brief that made two arguments, one of
> which was vindictive prosecution, based on how the charges
> involving A.G. and T.C. became involved.  Following some
> criticism by us of the reply brief, counsel met with FDAP and then
> filed a supplemental brief.  We issued our opinion, rejecting both
> arguments.

8

9

10

11

> Following our opinion, FDAP itself substituted in as attorney for
> Thompkins and, represented by J. Bradley O'Connell, Associate
> Director, filed a petition for rehearing, which, as pertinent here,
> again asserted a claim of vindictive prosecution.  We again rejected
> the claim. FDAP filed a petition for review, raising three claims:
> (1) vindictive prosecution; (2) hearsay/confrontation error; and
> (3) ineffective assistance of trial counsel.  The Supreme Court
> denied review, in an order that provided it was "without prejudice
> to the right to seek relief by way of petition for writ of habeas
> corpus as to ineffective assistance of counsel and ineffective
> assistance of appellate counsel."  FDAP then filed the within
> petition for writ of habeas corpus against the Director of the
> Department of Corrections and Rehabilitation (Director), asserting
> those two claims.  The Director filed informal opposition,
> Thompkins a reply, and we issued an order to show cause.  The
> Director then filed a traverse, Thompkins a return, and we held oral
> argument. We now deny the petition.

12

13

14

15

16

17

18

19

20

21

> **BACKGROUND**

22

> **The General Setting**

23

> In 2013, while he was in prison, Petitioner Raymond Thompkins
> (Thompkins or petitioner), met B.T., and they married soon
> thereafter.  B.T. had a daughter (mother) who had five children,
> three of whom would become involved in the charges here: sisters
> A.G., T.C., and J.G.  In February or March of 2015, mother asked
> B.T. to temporarily take custody of her five children while she
> searched for housing, and for a short while the three sisters, another
> sister, and their brother lived with B.T. and Thompkins—until April
> 18.

24

25

26

27

28

2

On April 18, Tara Gulley and her husband were approaching their truck after a walk on the Vallejo waterfront when she noticed Thompkins sitting in a nearby car with his head laid back, his eyes closed, and a three- to four-year-old girl, later identified as J.G., sitting on his lap. Thompkins was "panting," "had sweat on him," and an expression of "pleasure" on his face; "it just didn't look right." Gulley moved her truck to block Thompkins's car from leaving, and then walked up to the car and saw that the little girl was holding Thompkins's penis and moving her hand up and down. Gulley dialed 911, described what she had seen, and said that she had blocked the car. While she was on the phone, Thompkins and the little girl left the car and walked away, but they soon came back with three other children. Gulley moved her truck as instructed by the 911 operator, after which Thompkins and all four children entered his car and he drove away.

**The First Case and the Two Trials**

On April 21, 2015, the Solano County District Attorney filed a complaint, case No. VCR223508, charging Thompkins with committing a single count of lewd acts (Pen. Code1 § 288, subd. (a)) upon J.G., a child under 14 years of age, and alleging Thompkins had suffered three prior serious felony convictions. (§ 667, subd. (a)(1).) A preliminary hearing was held on June 16, where Gulley testified, and Thompkins was held to answer.

The developments following that complaint are at the heart of Thompkins's claim of vindictive prosecution and we set forth those developments in detail, with most of the facts taken from our opinion filed June 14, 2019.[] (*People v. Thompkins* (Jun. 14, 2019, A152363) [nonpub. opn.] (*Thompkins*).)

On June 19, an information was filed in the case, alleging the same single count charged in the complaint. And as in the complaint, the prior serious felonies were alleged only in connection with section 667, subdivision (a)(1), which imposes a five-year enhancement for the commission of a second serious felony. It was not alleged that the prior felonies subjected Thompkins to punishment under the three strikes law.

On the eve of trial, which had been set for August 5, Thompkins sought a continuance to allow counsel time to review discovery belatedly provided by the People. Trial was reset for April 6, 2016, which date was confirmed at a readiness conference on March 7, at which conference plea bargaining took place in the trial judge's chambers. On March 21, due to a conflict with another scheduled trial, the prosecutor moved for another continuance, and trial was reset for May 25. Then, on May 23, the prosecutor requested still another continuance, and trial was reset for June 2.

On May 31, Thompkins moved for further discovery. The parties also filed motions in limine, which were heard that day.

On June 2, the day last set for commencement of trial, 12 jurors and two alternates were selected and sworn.

3

On June 3, prior to the commencement of testimony, the prosecutor moved "to amend the information to allege defendant's strike prior," specifying a "strike prior from 1991 for kidnapping and robbery." The motion stated that "[i]t is unclear why the strike prior was excluded from the information. It appears to be an oversight since an enhancement based on that same prior was alleged in the information." The court adjourned the proceedings and directed jurors to return on June 9.

On June 8, Thompkins filed a non-statutory motion to dismiss the information "for due process violation and for prosecutorial misconduct" in delaying commencement of trial and refusing to disclose evidence that could be used to impeach Gulley. The next day, June 9, Thompkins moved to dismiss the information on the additional ground that the destruction or unavailability of a document containing Gulley's statement violated his due process right to a fair trial, as set forth in *California v. Trombetta* (1984) 467 U.S. 479 and *Arizona v. Youngblood* (1988) 488 U.S. 51.

The court refused to rule immediately on the two motions to dismiss, ordered the trial continued, and inquired of the jurors previously selected and sworn whether they could return at a future date. Too many jurors were unavailable, and the court declared a mistrial.

On July 6, the court granted the People's unopposed motion to amend the information to specify that a prior felony conviction subjected Thompkins to the "Three Strikes" law.

On July 20, a second jury was sworn in case No. VCR223508. On July 22 the jury announced it was unable to reach a verdict and the court declared a second mistrial. According to a statement of defense counsel—a statement the prosecutor did not dispute—the jury voted 10 to two for acquittal.

**The Second Case**

On August 9, the People filed a complaint in a second case, No. VCR227210, charging Thompkins with two counts on two newly alleged victims, A.G. and T.C. The district attorney advised the court that, although the new complaint did not allege the prior strikes in the first case, he intended to consolidate the two cases "and the prior strike and a five-year enhancement, as has already been alleged in [case No.] 223508," would continue to operate. Defense counsel remarked that the district attorney "can do that at any time. He doesn't need our approval to do that," after which the court stated: "That's fine. If both parties agree . . . that's possible." The court then inquired whether the parties were "deeming the complaint an Information?" The district attorney and public defender agreed they were, and Thompkins waived his right to a preliminary hearing, stating, "I will deem the complaint an information per your request."

4

1    On November 10, the court granted the People's motion to
consolidate the first case (VCR223508) and the second case
2    (VCR227210).

3    On November 21, the People moved to further amend the amended
consolidated information "to allege [a] strike prior."  The motion
4    stated that the initial case, No. VCR223508, "went to trial but the
jury hung and the court declared a mistrial.  The information in that
5    case alleged three prior strikes and a charged strike.  During plea
negotiations before trial, the People had warned that if they were
6    unsuccessful in securing a guilty verdict, they would bring
additional charges and seek a life sentence.  After the jury hung, the
7    People filed VCR227210 and moved to join the cases.  On
November 16, the court granted the People's motion to join cases
8    VCR223508 and VCR227210.  Now the People are moving to
amend the language to make it clear that they are seeking a life
9    sentence under the three strikes law." (*Thompkins*, *supra*,
A152363, at pp. 11−12.)
10

11    When the court inquired whether the proposed amendment "add[s]
new people, new victims?", the district attorney stated it did not,
12    saying "[i]t simply adds an extra paragraph making it clear we are
pursuing [a] three strikes penalty in this case.  The priors have
13    already been alleged since the very beginning, and we had invoked
the two-strikes law."  The court asked defense counsel whether
14    Thompkins objected to the motion to amend, and she said "no," but
then said "I should take that back, your Honor.  Given that they are
15    alleging—that this is a three strikes case, the underlying offenses, I
believe they are from one course of conduct.  So, of course, I would
16    object on that ground. . . ."

17    The court granted the request to amend.  As material here, the
amendment stated that Thompkins "has been convicted of the
18    following two or more serious and/or violent felonies, as defined in
. . . section 667[, subdivision] (d) and . . . section 1170.12[,
19    subdivision] (b)," and identified his three prior strikes.  The
amendment added that, "Furthermore, Counts ONE, TWO, AND
20    THREE is [*sic*] a serious and/or violent felony thus subjecting the
defendant to sentencing pursuant to the provisions of Penal Code
21    section 667[, subdivisions] (b)-(j) and Penal Code section 1170.12."
(*Thompkins*, *supra*, A152363, at pp. 11-12.)
22

23    On December 2, the district attorney moved to further amend the
amended consolidated information to correct specified
24    "miscellaneous language" and to add an allegation that the three
charged offenses were committed against multiple victims.
25    Defendant opposed the motion, relying on the doctrine of vindictive
prosecution.  The court rejected the argument and granted the
People's motion to amend.

26    **The Third Trial**

27    Trial on the consolidated cases began in April 2017.  The jury was
selected on April 13, following which counsel gave opening
28    statements.  The first day of testimony was April 14, testimony that

5

would be taken over three more days, April 18, 19, and 21.  Over 20 witnesses testified, including the victims A.G. and T.C.; J.G. was deemed incompetent to testify.  The testimony on the last day, April 21, included that from two expert witnesses, Anthony Urquiza on behalf of the People, followed shortly by William O'Donahue on behalf of Thompkins.  Dr. Urquiza's testimony is the basis of petitioner's claim of ineffective assistance of trial counsel here, and will be discussed in detail in connection with that claim.

In *Thompkins* we described for over six pages the facts put before the jury by those many witnesses.  And we quote extensively from that opinion, (referring to Thompkins as appellant), where we described those facts:

"Officer Jade McLeod, who responded to Gulley's 911 call, located and performed a traffic stop of appellant.  One child was in the front passenger seat and three children were in the back.  McLeod arrested appellant and later took a statement from Gulley.  After reviewing the videotape of his interview with Gulley, Officer McLeod realized that his report of the interview was erroneous in two respects.  Gulley did not tell him that the car seat appellant was sitting on was laid back, nor did she say appellant's penis was erect.  As instructed, McLeod took appellant to Kaiser Hospital in Vallejo for a sexual assault response team (SART) exam that was conducted there by Nurse Kari Cordero.

"Nurse Cordero conducted a sexual assault examination of appellant using a 'Woods lamp,' which 'flouresces' (i.e., lights up) any DNA, although it can fluoresce other substances, such as semen or saliva.  The Woods lamp lit up appellant's scrotum area.  Cordero also used a Q-tip to swab appellant's mouth, penis, and scrotum.  Cordero deposited all of the evidence she collected in a sexual assault kit, which was later transported to the Richmond laboratory of the Department of Justice.

"Heather Tomchick, a criminalist employed in the Richmond lab, conducted an analysis of the swabs taken from appellant and found semen present in both the penile and scrotal swabs.

"At some point after appellant was arrested, J.G. was placed in the foster home of Kenneth Boyd and his wife, who had been foster parents for 17 years.  Kenneth Boyd testified that J.G. had been in his home for 'maybe a year or longer,' and 'frequently' exhibited 'unusual behavior,' such as inserting toys into her vagina and touching her private parts with her own hands.'  He also would see her 'humping on the bed,' and 'taking her clothes off in front of other children,' and she had frequent tantrums.  Caring for J.G. 'got to be too much,' he stated, because she required a higher level of care than he was paid for, so he gave up the placement.

"Clinical Social Worker Stephanie Ladd testified that some of the behavior Kenneth Boyd described was not 'developmentally normal.'  Asked whether it was 'developmentally appropriate or common' for a five-year-old girl 'to insert things into her vagina,'

6

Ladd stated that it is 'usually a red flag' because 'children learn based on what they have seen or experienced.'

"A.G., who was seven years old at the time of trial, testified that T.C. and J.G. were her sisters. When asked whether she had ever seen appellant, who she and her sisters called 'Poppa Ray' or 'Papa Ray,' touch anyone in a way that was a 'bad touch?' she answered 'No.' Asked did she 'ever sit in Poppa Ray's lap?' she said 'I don't know.' Asked whether she remembered talking to a lady one day in a conversation that was videotaped she said 'No.' Asked 'has Poppa Ray ever taken off your clothes?' she made no response. When the district attorney inquired whether 'there is anything that would help you be able to talk?' A.G. said 'I don't know.' At that point the court declared a brief recess.

"When the proceedings resumed, defense counsel asked A.G. a series of questions regarding her past experiences with Starla and Leanne, who had apparently interviewed her during dependency proceedings or appellant's prior criminal trial, and statements she made to them, such as whether she remembered telling these two women 'that Poppa Ray did not touch you' and that she told her mother that a Wendy had 'told you to lie.' A.G. did not remember those questions or much of anything else she was asked about. However, when asked by the district attorney on redirect whether she had been 'telling the truth here today?' A.G. said 'Yes' and said 'No' when asked whether she was 'telling any lies here today.' At that point, the court initiated a conversation with A.G. establishing that she was 'uncomfortable' and did not want to talk 'about good touches and bad touches.' The court then asked counsel 'can we allow [A.G.] to leave?' and both answered 'yes.'

"Over objection, the district attorney was permitted to play a videotaped interview with A.G. that took place about two years earlier, when she was five years old. A.G. stated in the interview that when she was in the bathroom brushing her teeth her grandfather touched her private part and her behind over her clothes. At another time he touched her 'private part' while she was in her bedroom. At that time he pulled down her pants but not her underwear. Appellant's skin did not touch A.G.'s skin. When A.G. told appellant she did not want him to touch her 'body parts' he said 'no.' He also told her 'don't tell anyone' and A.G. did not. A.G. considered what appellant did to be 'bad.' A.G. said she saw appellant touch T.C.'s body part over her clothes when T.C. was in the bathroom. When asked whether what 'Papa Ray' did was good or bad, A.G. answered 'bad.' Asked whether appellant ever asked her to touch his body parts, A.G. answered 'no.'

"Nine-year-old T.C.'s testimony under oath was perhaps even more evasive than that of A.G., so that she too was excused, and the court allowed into evidence her previously videotaped interview.

"In that interview, which took place shortly after appellant was arrested two years earlier when she was seven years old, T.C. stated that on a Sunday when her grandmother was still in bed, she was sitting in a rocking chair in the living room when appellant told her

7

to get up.  When she moved to the couch, appellant followed and did not stop when she told him to.  He tried to touch her in her 'private, in the back, B-U-T-T' with his hand under her clothes.  He also pinched her nipples once (which the interviewer referred to as 'nip-nips').  A.G. also said appellant touched her inside a 'private' she described as the 'middle' and a 'different place' than her butt.  Appellant did not stop when she told him to, but 'kept doing it.'  When he finally stopped, T.C. got up and told her grandma and '[s]he told him to stop' and '[t]hen he did.'  T.C. was six when this happened.  T.C. also stated that she had seen [defendant] touch J.G.'s butt with his hand under her clothes, and A.G.'s 'private part.'  J.G. had told T.C. that appellant 'put his hand in her private, her front and . . . her back.'

"T.C. also said she saw appellant put his hand in J.G.'s tights, and his hand was '[g]oing all over the place.'  J.G. said nothing at the time but later told T.C. that Papa Ray 'kept digging in back and in the front.'  On the occasion that T.C. saw appellant put his hand in A.G.'s privates, appellant told her not to tell her grandmother, because 'he didn't want her to know.'  Appellant said he would 'ground me and whoop me' if she told her grandmother, but she told her anyway because 'I didn't wanna keep a secret.'

"B.T., appellant's wife and the grandmother of J.G., A.G., and T.C., testified that at the time the three girls were living in their home, appellant was working at the Gap in San Francisco and would be gone from 4:00 in the morning until after 6:00 or 7:00 at night.  Every Saturday she took the family to church and would never leave her grandchildren at home.  Mother visited them 'practically seven days' a week.

"After the family returned home from church on April 18, 2015, the children asked appellant to take them to the waterfront to feed the birds.  Appellant took them there and during that time talked to B.T. on the phone for 30 minutes.

"B.T. denied T.C. ever told her that appellant had touched her or any of the other girls.  She also stated that her granddaughters did not use the phrase 'private parts' but instead called such bodily parts 'punani.'  B.T. again denied that appellant was ever home alone with her grandchildren.

"Mother of the three alleged victims testified that during the time the children stayed at B.T.'s home she visited them there every day in the morning before school and in the afternoon after school, and appellant was never present.  B.T. (grandmother of the three alleged victims) always took the children with her when she went to church on Saturday or anywhere else unless Mother was with them; she would not leave the children in [defendant's] care because 'he wasn't trustworthy.'

"T.C. and A.G. never used the term 'private parts' Mother stated, but called those parts of their body 'kit-kit.'  Neither T.C., J.G., nor A.G. ever told her they had been touched by appellant.  When Mother asked one of them—it was either A.G. or T.C. but she could

not recall which one—why she stated in the taped interview that appellant had touched her, she said that the social worker, Wendy, 'told me to say it.'  Mother continued to visit her daughters after they were placed in foster care. J.G. was placed in three different homes.  During the time she was at Kenneth Boyd's foster home 'she was hitting me.  Which is not her at all.  She was really violent towards her sisters and brother.'  And there were 'reports that she was taking off her underwear and throwing them on the ground in the back yard and touching other little kids inappropriately and, yeah, that sort of stuff.'

"Mother stated that she was going to court to get reunification services but denied there was any danger of losing her parental rights.  She admitted she 'hated' certain social workers because '[t]hey took my kids.'  Asked whether she remembered having a discussion with Social Worker Wendy Smith in which 'she asked you what it would mean to you if the girls had disclosed abuse to Wendy Smith, and you said it would mean that you failed and you weren't as close to the girls as you thought?'  Mother denied that that was what she said.  What she had said was, 'I'm confident in my relationship with . . . all four of my daughters.  And I was willing to bet money that if anything had ever happened, they would tell me.  I would be the first person to know.'

"Latoya, a cousin of J.G., A.G., and T.C., testified that when T.C. was in foster care, she asked Latoya, 'when do I get to go home?'  After Latoya said she did not know, T.C. 'said she was lying about something, but she never—she wasn't specific about what she was lying about.'

"The girls' brother, who was 11 years old at the time of trial, remembered going to the Vallejo waterfront with appellant two years earlier on April 18, 2015, to feed the birds.  He thought three of his four sisters went with them but was unable to remember which ones.  He did remember that when he returned to their car he saw that J.G. was asleep and appellant was playing a game on his phone.

"Wendy Smith was a social worker assigned to Solano County Child Welfare Services to investigate a dependency proceeding involving J.G., A.G., and T.C.  She met with them 10 to 20 times prior to the time of their videotaped interviews, which she did not attend.  However, she did not discuss the events that allegedly took place at the waterfront on April 18, 2015, until June 30, about 72 days later.  At that time, the children were aware of the allegations against [defendant] but had made no statements regarding them.  When Smith began discussing the allegations (i.e., the allegations of Gulley about what happened on April 18, 2015), 'the girls began to disclose beyond what was initially disclosed.'  When asked if the alleged conduct of [defendant] only happened one time on April 18, and only to J.G., the children indicated it happened more than one time and to others beside J.G.

"Kwanda Sylvester, a Solano County social worker assigned [to] the three girls in October 2015, never saw J.G. act out 'sexually.'

9

Though she had been placed in at least three different foster homes, Kenneth Boyd was the only foster parent who ever expressed concerns about J.G. acting out sexually during the four- or five-months Sylvester was assigned to the girls.

"Dr. William O'Donahue, a professor of clinical psychology at the University of Nevada who specializes in child sex abuse, spent 10 hours reviewing 25 documents regarding appellant and the allegations against him in this case." (*Thompkins*, *supra*, A152363, at pp. 2-8.)

On April 26, the court gave preliminary instructions, counsel gave closing arguments, the court gave its concluding instructions, and at 11:45 a.m. the case was in the hands of the jury. That afternoon the jury requested an exhibit and readback of the testimony of Officer McLeod and Gulley. The readback occurred and deliberations resumed.

Deliberations continued on April 27, in the afternoon of which the jury announced it had reached a verdict. The jury acquitted Thompkins on the count involving J.G., but convicted him on the counts involving A.G. and T.C. The jury also found true both the original "serious felony" allegation and the "third strike" allegation. The court thereafter imposed an aggregate sentence of 60 years to life, consisting of consecutive "third strike" terms of 25 years to life for each lewd act, and two five-year enhancements (§ 667, subd. (a)(1)) on each term.

On August 23, Thompkins appealed.

**The Appeal and Our Opinion**

First District Appellate Project (FDAP) panel attorney Orzo Childs was appointed as counsel for Thompkins on appeal. On July 3, 2018, Mr. Childs filed his opening brief, which made two arguments: (1) the conviction and prior strike enhancement must be reversed because charging them constituted prosecutorial vindictiveness, and (2) erroneous admission of videotaped testimony of victims violated the confrontation clause. There was no claim of lack of substantial evidence to support the convictions, nor attacking the quality of the evidence. Other than the evidentiary claim as to the videos, there was no claim of any error by the trial court, not in the giving of instructions or in responding to the jury's request. There was no claim of prosecutorial misconduct. Finally, and perhaps significant on the first issue here, Mr. Childs—or for that matter, FDAP—made no claim of ineffective assistance of trial counsel.

Mr. Childs's briefing of the vindictive prosecution claim is at the heart of petitioner's second claim here, which initial briefing cited four cases: *North Carolina v. Pearce* (1969) 395 U.S. 711; *Blackedge v. Perry* (1974) 417 U.S. 21; *Twiggs v. Superior Court* (1983) 34 Cal.3d 360 (*Twiggs*); and *In re Bower* (1985) 38 Cal.3d 865 (*Bower*). The argument relied on "due process under the 14th Amendment of the United States Constitution," and had no

reference to any protections of the California Constitution (art. I, §§ 7, 15), arguing that "penaliz[ing] a defendant by filing new charges in response to his assertion of a right to trial denies due process under the 14th Amendment" and that "vindictiveness is presumed when the prosecution ups the ante after a mistrial."

The Attorney General's respondent's brief devoted 14 pages to the vindictive prosecution claim and discussed numerous cases not cited in Thompkins's opening brief, including federal circuit court opinions.  The Attorney General's principal argument was that the increased charges were "part of the give-and-take of the plea bargaining process," and that because the possibility of those charges had been mentioned during negotiations before the first trial, there was no presumption of vindictive prosecution.

On December 13, Mr. Childs filed his reply brief.  And in an order filed February 14, 2019, we said this about that reply brief: "Insofar as it addresses the issue of prosecutorial vindictiveness, appellant's reply brief consists of no more than a page and a half reiteration of the argument made in the opening brief.  The brief does not mention, let alone analyze and respond to, any of the numerous state and federal cases cited and discussed by respondent. . . ."  Our order directed counsel to "file a supplemental reply brief addressing the case law relied upon by the Attorney General" and to "also address the applicable standard of review."

On April 2, 2019, Mr. Childs filed a supplemental reply brief.  As to what happened leading to that brief and what followed it, we quote from Thompkins's petition (with all record references omitted): "In view of the Court's evident concerns as to the adequacy of the prior briefing, FDAP consulted with appellate counsel Childs on the matters to address in the supplemental reply brief.  FDAP provided extensive substantive comments on analysis of the vindictive prosecution issue for his draft brief.  [Citation.]  Mr. Childs's supplemental reply brief [citation] did incorporate a number of FDAP's recommendations.  However, the that [*sic*] brief still failed to address two crucial substantive subjects urged in FDAP's recommendations [citation].

"Like counsel's previous briefs, the supplemental reply brief said nothing about the independent state constitutional basis of the California Supreme Court's leading vindictive prosecution cases, *Twiggs v. Superior Court* and *In re Bower* [citation]; and the brief did not explicitly address the role of prior attachment of jeopardy in the leading cases' analysis of the circumstances giving rise to a presumption of vindictiveness [citation]."  A footnote added this: "[t]he supplemental reply did include two sentences, specifically suggested by FDAP in its marked comments on Mr. Childs's draft, which mentioned jeopardy.  [Citation.]  But the brief did not include any explicit discussion of the role of prior attachment of jeopardy in the leading cases' analysis of vindictive prosecution. [Citation.]"

"At the time of its consultation with Mr. Childs on the supplemental reply brief, FDAP had also specifically urged him to submit a

11

separate supplemental brief seeking a resentencing remand under recent litigation giving sentencing courts discretion to strike 5-year 'serious felony' enhancements.  (Stats. 2018, ch. 1013 ([Senate Bill No.] 1393).)  Such enhancements, which accounted for 10 years of Mr. Thompkins's 60-to-life sentence, had been mandatory at the time of the original sentencing.  However, Mr. Childs failed to file any supplemental brief on that sentencing issue during the three months between FDAP's advice and this Court's issuance of its opinion.  [Citation.]"

On June 14, we filed our unpublished opinion, rejecting both of Thompkins's claims.  Our opinion was 31 pages long, over six pages of which was the recitation of facts, many of which are quoted here.  We devoted over 15 pages to discussing—and rejecting—the vindictive prosecution claim, concluding that the increased charges did not raise a presumption of vindictiveness because the prosecution had raised the possibility of adding the charges during pretrial negotiations.  As we put it, "The fact that in this case the additional charges were added after a mistrial and before the subsequent retrial does not change the result, given that the prosecution had informed appellant of the possibility of such charges during plea negotiations that took place well before the prior trial ended in a mistrial."  (*Thompkins*, *supra*, A152363, at p. 23.)

**Developments Following Our Opinion**

Thompkins's petition describes what happened following our opinion, and we again quote from that petition: "After the Court filed its original opinion, FDAP suggested that Mr. Childs request leave to withdraw, so that new counsel could substitute into the case.  FDAP made that recommendation due to concerns over the quality of Mr. Childs's work, including: 1) the strong criticism of his original briefing in the Court's February 2019 order; 2) his failure to follow through on important points suggested in FDAP's recommendations on the supplemental reply brief; and 3) his failure to act on FDAP's recommendation that he file a separate supplemental brief seeking a resentencing remand for reconsideration of the serious felony enhancement pursuant to S.B. 1393.  [Citation.]

"Mr. Childs agreed to request withdrawal.  [Citation.]  On June 24, 2019, on FDAP's recommendation, the Court vacated Mr. Childs's appointment and reassigned the *Thompkins* appeal as a FDAP staff case.  [Citation.]"  FDAP substituted in, replacing Mr. Childs, and on June 28, FDAP filed a petition for rehearing.  As the petition describes it, "FDAP immediately filed a rehearing petition raising two grounds—(1) a request for a remand for the sentencing court to exercise its newly-conferred discretion as to the section 667[, subdivision] (a) enhancements; and [(2)] . . . that the Court reconsider its disposition of the vindictive prosecution claim."

On July 12, we filed an order modifying the opinion that remanded the case for the sentencing court to exercise its discretion under the

1    newly-enacted section 667, subdivision (a)(1), (Stats. 2018, ch.
     1013, §§ 1-2.) (S.B. 1393).[]  We otherwise denied rehearing.
2

3    On July 29, FDAP filed a second petition for rehearing, raising a
     claim of ineffective assistance of trial counsel.  On August 12, we
     denied the petition without modification of our opinion.
4

5    On August 21, FDAP filed a petition for review, raising three
     claims: (1) vindictive prosecution; (2) hearsay/confrontation error;
     and (3) ineffective assistance of counsel.  On October 30, the
6    Supreme Court denied review, in an order that provided it was
     "without prejudice to the right to seek relief by way of petition for
7    writ of habeas corpus as to ineffective assistance of counsel and
     ineffective assistance of appellate counsel."
8
     **The Petition for Writ of Habeas Corpus**
9

10   On July 17, 2020, represented by Mr. O'Connell, Thompkins filed
     this petition for writ of habeas corpus naming the Director. . . . We
     now deny the petition.
11

12   ECF No. 18-11 at 218-36.

13                              **Discussion**

14        I.      **Legal Standards**

15        A federal court may grant habeas relief when a petitioner shows that his custody violates

16   federal law.  *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75

17   (2000).  Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty

18   Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition.  *See Harrington v. Richter*,

19   562 U.S. 86, 97 (2011).  To decide a § 2254 petition, a federal court examines the decision of the

20   last state court to have issued a reasoned opinion on petitioner's habeas claims.  *See Wilson v.*

21   *Sellers*, 584 U.S. 122, 125 (2018); *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003)

22   ("Because, here, neither the court of appeal nor the California Supreme Court issued a reasoned

23   opinion on the merits of this claim, we look to the trial court's decision."); *McCormick v. Adams*,

24   621 F.3d 970, 975-76 (9th Cir. 2010) (reviewing the decision of the court of appeal, which was

25   last reasoned decision of a state court); *Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003)

26   ("Because the California Supreme Court denied review of Gill's habeas petition without

27

28

                                        13

comment, we look through the unexplained California Supreme Court decision to the last

reasoned decision . . . as the basis for the state court's judgment.") (internal quotations omitted).

Under the AEDPA, a petitioner may obtain relief on federal habeas claims that have been

"adjudicated on the merits in state court proceedings" only if the state court's adjudication

resulted in a decision (1) "contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States" or (2) "based

on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."  28 U.S.C. § 2254(d).

## II.    Analysis

### A.    Confrontation Clause

Petitioner argues that the admission of the victims' videotaped statements violated his

right to confront the witnesses against him under *Douglas v. Alabama*, 380 U.S. 415 (1965).  ECF

No. 1 at 5.  Relying on his prior briefing, he contends that the child witnesses' perfunctory court

appearances and refusals to answer substantive questions frustrated his ability to conduct a

legitimate cross-examination.  *Id.* at 43-47.  Petitioner raised this claim in his direct appeal, where

the state appellate court rejected the claim:

> **II. *The Prior Videotaped Statements of A.G. and T.C. Were Properly Admitted***
>
> Appellant claims the admission of videotaped out-of-court statements by A.G and T.C. as prior inconsistent statements and exceptions to the hearsay rule under Evidence Code sections 1235 and 1360 was error.[1]

---

[1] [FN from opinion] Relying on the opinion of the California Supreme Court in *People* v. *Green* (1969) 70 Cal.2d 654, which dealt with Evidence Code section 1235, appellant also maintains that admission of these out-of-court statements violated his rights to due process of law and confrontation.  But appellant acknowledges that that opinion was overruled by the United States Supreme Court in *California* v. *Green* (1970) 399 U.S. 149, which permits the use of otherwise admissible hearsay testimony in this case.  Appellant's real claim is that "*Green v. California* [*sic*] should be overturned," which we cannot do.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  Because appellant has provided no additional argument, beyond a conclusory sentence or two, as to why admission of the videotaped interviews under Evidence Code sections 1235 and 1360 violated his federal constitutional rights to due process and confrontation, we will not address those unsupported claims.

1

A.G.'s testimony was highly equivocal. She identified appellant
but could not say how she knew him or whether she spent much
time with him. She was unable or unwilling to say whether
appellant made her feel uncomfortable. While she knew the
difference between a "good touch" and a "bad touch," she did not
respond to the question whether appellant "would do any bad touch
to you," which made her nervous. Nor did A.G. answer when
asked by the district attorney whether anyone had ever touched her
in a way that made her feel uncomfortable and could not remember
whether she had ever sat in appellant's lap. A.G. was also unable to
remember her videotaped interview and did not answer when asked
whether appellant had taken off her clothes. When asked "is there
anything that would help you to be able to talk?" she said "I don't
know." She shook her head "from side to side," (indicating "no")
when asked if she would like a glass of water or anything like that,"
and whether it would "be helpful to take a break." On brief cross-
examination, A.G. remembered the woman who picked her up the
day appellant "went to jail"; but did not remember telling the
woman what she called her private parts. Asked if she remembered
telling her mother that "Ms. Wendy told you to lie," A.G. said she
did not.

2

3

4

5

6

7

8

9

10

11

12

On redirect, after A.G. testified that she was telling the truth, and
knew how important it was to do that, the court asked A.G.: "Am I
correct that you just don't feel comfortable? You don't want to talk
about good touches or bad touches?" A.G. said ''yes.'' With the
approval of counsel, the court then thanked A.G. for her testimony
and allowed her to leave.

13

14

15

16

At that point, the district attorney sought leave to admit a
videotaped interview with A.G. on the ground of Evidence Code
section 1360, which provides that in certain circumstances, "[i]n a
criminal prosecution where the victim is a minor, a statement made
by the victim when under the age of 12 describing any act of child
abuse . . . performed with or on the child by another . . . is not made
inadmissible by the hearsay rule . . ." (Evid. Code, § 1360, subd.
(a).)

17

18

19

20

At a hearing at which the jury was not present, the public defender
argued, in effect, that A.G. did not "testify" within the meaning of
the statute in that "she wouldn't talk about the alleged offense" and
appellant therefore "did not have an opportunity to actually
confront and cross-examine her." The district attorney answered
that appellant forfeited the objection because "the defense attorney
asked a handful of very limited, very circumscribed questions that
were designed to help the defense. They could have questioned her
about some of these topics. I think they had an obligation to do so
if they wanted to raise this objection, and they didn't."

21

22

23

24

25

26

The court found the videotape interview admissible, concluding
that, as required by Evidence Code section 1360, "the child did
testify" and the "contents and circumstances of that interview . . .
had sufficient indicia of reliability." Among other things, the court
noted, "nothing in that interview was particularly leading or
coercive" and "the defense had an opportunity to cross her. And I

27

28

think it, again, chose not to ask certain questions." The court concluded that the defense "had those opportunities" to confront A.G.

The court reached the same conclusion with respect to the previously videotaped interview of T.C.

T.C., who was A.G.'s sister, was 9 years old at the time of trial. She knew the difference between the truth and a lie, and that lying was "bad." She testified that when she lived with appellant and her grandmother, she was sometimes alone with appellant but he never touched her in a way that made her uncomfortable or took her clothes off. When asked whether she wanted to talk about Poppa Ray, T.C. said "no" and agreed with the prosecutor's suggestion that this was "because you don't want to be here." She also said there was nothing that would make her more comfortable talking about appellant. Finally, asked whether she had ever told anybody that Poppa Ray had touched her inappropriately, T.C. said: "No." After the public defender said she had no further questions of T.C., the court excused the child.

When the prosecutor moved to admit the videotaped interview of T.C. pursuant to Evidence Code section 1360, the defense objected on the ground that it had no "opportunity to confront her." The public defender argued that "[essentially [T.C.'s] comments were, 'No, no, no, no.' So there was nothing there for the defense to actually elicit from her, quite frankly, or to expound on." The district attorney took the position that T.C's answers to his questions "clearly helped the defense. They were satisfied. They chose not to cross-examine her for strategic reasons. I think they forfeited any claim to a confrontation by omission."

Admitting the videotape, the court explained that T.C.'s testimony at the Evidence Code section 402 hearing (on the issue of her competency to testify) was very reluctant. She refused to fully enter the courtroom and testified while standing near the door, as the court allowed without objection by either party. But she did answer the prosecutor's questions and, "given her age and the nature of the questions, she was competent" to testify. T.C. "knew the difference between the truth and a lie, the importance of telling the truth and answered a series of questions in monosyllabic 'yes' or 'no'" and "answered most of the questions that were proposed to her." "When asked specifically if she knew who Poppa Ray was," and whether he "had touched her inappropriately in any way, she said no. Her direct testimony ended. I then offered [the public defender] an opportunity to ask questions, and you chose not to. And she was then excused." For these reasons, the court found that T.C. was competent, that she answered questions "to the benefit of the defendant," and that under these circumstances, "the People would be allowed to produce prior inconsistent statement[s] of their witness" pursuant to Evidence Code section 1235, in the form of the videotaped interview.

Reviewing T.C.'s statements during the interview for purposes of Evidence Code section 1360, the court found her to be a minor

1   child under the age of 10 and, the content of the statements and the
    circumstances in which they were made "provided sufficient indicia
2   of reliability."

3   The standard of review for rulings on the admissibility of
    evidence—including the admissibility of prior inconsistent
4   statements under Evidence Code section 1235 and the application
    of Evidence Code section 1360—is abuse of discretion. (*People v.*
5   *Hovarter* (2008) 44 Cal.4th 983, 1007-1008; *People v. Roberto V.*
    (2001) 93 Cal.App.4th 1350, 1367.)  Under that standard, "a trial
6   court's ruling will not be disturbed, and reversal of the judgment is
    not required, unless the trial court exercised its discretion in an
7   arbitrary, capricious, or patently absurd manner that resulted in a
    manifest miscarriage of justice.  [Citation.]"  (*People v. Guerra*
8   (2006) 37 Cal.4th 1067, 1113; *see People v. Rowland* (1992) 4
    Cal.4th 238, 264.)
9
    First, as to Evidence Code section 1235,[] appellant argues that the
10  videotaped interviews of A.G. and T.C. cannot be deemed
    inconsistent with their testimony under oath because neither of
11  them in fact testified at trial.[]  According to appellant, "A.G. gave
    no testimony relating to the alleged facts of this case, and therefore
12  her forensic interview was not inconsistent with her testimony
    under oath.  Indeed, her only positive assertion was that she never
13  saw appellant touch anyone else in a way that was a 'bad touch'" so
    that "her forensic interview was not inconsistent with her testimony
14  on the witness stand."  Appellant argues this was also true of T.C.,
    because "she gave no evidence as to any fact" and essentially
15  "refused to testify."  Appellant claims that where, as here, "a
    witness refuses to testify, prior out-of-court statements are
16  inadmissible and a violation of the defendant's confrontation
    rights."
17
    Appellant's sole authority for this proposition is *People v. Rios*
18  (1985) 163 Cal.App.3d 852 (*Rios*),[2] which held that since the two
    witnesses in that case gave no actual testimony, there were no
19  statements in the record from which to infer or deduce implied
    inconsistency for purposes of Evidence Code section 1235.  The
20  hearsay statements of the witnesses in *Rios*, which were intended to
    corroborate accomplice testimony, were originally made to an
21  investigating police officer and, when the witnesses refused to
    answer any questions at trial, the court concluded that their refusals
22  constituted.an evasion or implied denial of their earlier statements.
    The statements were introduced through the testimony of the
23  investigating officer and the prosecutor's questions of the witnesses
    themselves, who refused to answer.
24

25  _____

26      ² [FN from opinion] Appellant does say, without elucidation, that we should also "*see*
    *People v. Shipe* [(1975)] 49 Cal.App.3d 343; *Douglas v. Alabama* (1965) 380 U.S. 415," but we
27  do not know why.  Both cases involve witnesses who refused to testify on Fifth Amendment
    grounds and neither case relates to the admissibility of evidence under Evidence Code sections
28  1235 or 1360 or similar statutes.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The language in *Rios* appellant presumably relies upon is that "a prior statement is not admissible where the record shows no reasonable basis for concluding the witness' responses are evasive and untruthful. [Citations.] While our Supreme Court has not elucidated what kind of record is necessary to support a finding of evasiveness [citation], the appellate courts have consistently applied the rule set forth in *People v. Sam* [(1969) 71 Cal.2d 194, that] there is no 'testimony' from which an inconsistency with any earlier statement may be implied when the witness honestly has no recollection of the facts [or] . . . where a witness gives no testimony and refuses to answer all questions." (*Rios, supra*, 163 Cal.App.3d at p. 864.)

Appellant's assertion that *Rios* "is very much in point" is unfathomable. The opinion is manifestly distinguishable. A.G. and T.C. did testify, as Evidence Code section 1235 requires, albeit with considerable concision and reluctance. As the trial court noted, they answered almost all of the questions put to them by the prosecutor. The public defender's decision to forego cross-examination seems to us, as it did to the trial court, obviously strategic, because the minors' testimony was favorable to the defense and further inquiry might prove damaging. Moreover, the evasive testimony of the minors could hardly be more obviously inconsistent with their prior out-of-court statements. Therefore, the court did not abuse its discretion when it found the videotaped interviews admissible under Evidence Code section 1235. (*See People v. Hovarter, supra*, 44 Cal.4th at pp. 1007-1008.)

Second, appellant argues that the videotaped interviews were inadmissible under Evidence Code section 1360[] because "the children did not testify in any meaningful way, and could not be cross-examined . . . ." As we have already explained, however, both children did testify at trial, at which time defense counsel had the opportunity to cross-examine them. (*See* Evid. Code, § 1360, subd. (a)(3)(A).) Hence, the court did not abuse its discretion when it found that the videotaped interviews were admissible pursuant to Evidence Code section 1360. (*See People v. Hovarter, supra*, 44 Cal.4th at pp. 1007-1008; *compare People v. Roberto V., supra*, 93 Cal.App.4th at p. 1356 [holding that where alleged victim did not testify, "because neither the notice nor the unavailability requirement was met, the challenged hearsay statements were not properly admitted pursuant to Evidence Code section 1360," and, "[m]oreover, because there was an insufficient showing that the statements were reliable, their admission violated appellant's rights under the confrontation clause of the United States Constitution, requiring reversal"].)

ECF No. 18-7 at 129-35. The California Supreme Court denied petitioner's petition to review this issue. ECF No. 18-9 at 88.

18

1     Petitioner's claim should be denied.  The Sixth Amendment provides that "[i]n all

2  criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses

3  against him."  U.S. const. amend. VI.  As such, an absent witness's testimonial statements can

4  only be admitted when the declarant is unavailable, and the defendant has had a prior opportunity

5  to cross-examine that witness.  *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

6     When it comes to cross-examination, the Sixth Amendment only guarantees that

7  defendants have "an *opportunity* for effective cross-examination, not cross-examination that is

8  effective in whatever way, and to whatever extent, the defense might wish."  *United States v.*

9  *Owens*, 484 U.S. 554, 559 (1988) (internal quotation marks omitted) (quoting *Kentucky v. Stincer*,

10  482 U.S. 730, 739 (1987)).  The Sixth Amendment does not guarantee that a witness's testimony

11  will not be "marred by forgetfulness, confusion, or evasion."  *Delaware v. Fensterer*, 474 U.S.

12  15, 22 (1985).  "To the contrary, the Confrontation Clause is generally satisfied when the defense

13  is given a full and fair opportunity to probe and expose these infirmities through cross-

14  examination, thereby calling to the attention of the factfinder the reasons for giving scant weight

15  to the witness' testimony."  *Id.*

16     Here, petitioner had sufficient opportunity to cross-examine both victims regarding their

17  prior statements incriminating petitioner.  While the victims may have been evasive, the Sixth

18  Amendment does not guarantee that witnesses will not be evasive.  *See id.*  Instead, it merely

19  requires that defendants have the opportunity to cross-examine witnesses—an opportunity

20  petitioner was afforded.

21     Petitioner points to *Douglas* as supporting his argument, but just as the state court

22  concluded, *Douglas* is not analogous.  In *Douglas*, the Supreme Court reversed a defendant's

23  conviction when the state read to the jury an accomplice's confession.  380 U.S. at 416-17.

24  There, the accomplice took the stand but invoked his Fifth Amendment right against self-

25  incrimination and refused to answer any and all questions presented by the state and defense.  *Id.*

26  at 419-20.  The Supreme Court held that the defendant's inability to cross-examine the

27  accomplice regarding the confession because of the accomplice's outright refusal to answer

28  "plainly denied" the defendant the right to cross-examine.  *Id.*  In the current case, the victims did

1    not refuse to answer questions, and petitioner's counsel had the opportunity to question the

2    victims regarding their version of events.  As such, petitioner's Sixth Amendment claim should

3    be denied.

4         **B.    Vindictive Prosecution**

5         Petitioner also argues that the state filing three-strike charges against him evidenced

6    vindictive prosecution, which violated his right to due process.  ECF No. 1 at 7.  Relying on his

7    direct appeal briefing, he contends that the presumption of vindictiveness should have applied to

8    his case because the charges were not increased until after two mistrials.  *Id.* at 32, 34.  He

9    contends that the timing of the state's decision to increase his charges matters, because it occurred

10   after jeopardy attached.  *Id.* at 37-38.  Petitioner raised this claim in his direct appeal, where the

11   state appellate court rejected his claim:

12         **I. *The Claim of Prosecutorial Vindictiveness Is Without Merit***

13         Appellant claims the prosecutor's addition of two new charges and
           new prior strike allegations in the second case constituted
14         prosecutorial vindictiveness.

15         **A. *The Prior Proceedings***

16         . . .

17         **B. *Legal Analysis***

18         ***The Standard of Review***

19         As the Attorney General points out, and appellant appears to agree,
           the California Supreme Court has not articulated the standard of
20         review for a vindictive prosecution claim.[]  The parties also agree,
           as we do, that the issue presents a mixed question of law and fact.
21         The usual practice for review of mixed question determinations
           affecting constitutional rights is to subject the ruling under
22         consideration to independent review.  (*People v. Cromer* (2001) 24
           Cal.4th 889, 901.)  Accordingly, we shall accept the relevant facts
23         found by the trial court where supported by substantial evidence
           and subject to independent judgment the trial court's legal
24         determination that such facts do not establish prosecutorial
           vindictiveness.
25
           ***The Relevant Law***
26
           "The constitutional protection against prosecutorial vindictiveness
27         is based on the fundamental notion that it 'would be patently
           unconstitutional' to 'chill the assertion of constitutional rights by
28         penalizing those who choose to exercise them.'"  (*In re Bower*

(1985) 38 Cal.3d 865, 873 (*Bower*), quoting *United States v. Jackson* (1968) 390 U.S. 570, 581.) The defendant in *Bower* was originally charged with second degree murder. However, after he had exercised his right to a fair trial by successfully moving, based on prosecutorial error, for a mistrial, the prosecutor increased the charge on retrial to first degree murder. Finding "a reasonable likelihood of vindictiveness" due to the prosecution's "obvious institutional interest in avoiding the duplication of effort and increased expenditure of resources attendant on the retrial of such a case," the *Bower* court applied the presumption of vindictiveness, which "protects against the danger that such institutional pressures might subconsciously motivate a prosecutorial response to a defendant's motion for mistrial made at this late stage in the proceedings." (*Bower*, at p. 877, citing *Thigpen v. Roberts* (1984) 468 U.S. 27, 31 and *United States v. Goodwin* (1982) 457 U.S. 368, 376, 377, 383.) "The presumption also aims to free the defendant of the apprehension that the exercise of a right designed to guarantee that his or her trial is fair will be met with a retaliatory increase in the charge and potential period of incarceration to which he or she is subjected." (*Bower*, at pp. 877-878.)

*Bower* relies heavily on the earlier Supreme Court opinion in *Twiggs v. Superior Court* (1983) 34 Cal.3d 360 (*Twiggs*). In *Twiggs*, the prosecution moved to amend the information to add five prior felony conviction allegations shortly after the defendant refused an offered plea bargain after a mistrial and invoked his right to a retrial. The court applied the presumption of vindictiveness because no new facts were developed at trial which could have legitimately caused their addition, the prosecution made no efforts to verify the prior convictions despite knowledge of them prior to the first trial, and the prosecution demonstrated no interest in charging them until the defendant had insisted on a new trial. Once such a presumption arises, *Twiggs* holds, "the prosecution bears a heavy burden of rebutting the presumption with an explanation that adequately eliminates actual vindictiveness." (*Id.* at p. 374.) "The prosecution should be required to show that facts that would legitimately influence the charging process were not available when it exercised its discretion to bring the original charges." (*Ibid.*) As the proposition was stated in *Bower*: "In order to rebut the presumption of vindictiveness, the prosecution must demonstrate that (1) the increase in charge was justified by some objective change in circumstances or in the state of the evidence which legitimately influenced the charging process and (2) the new information could not reasonably have been discovered at the time the prosecution exercised its discretion to bring the original charge." (*Bower*, *supra*, 38 Cal.3d at p. 879.)

*Bower* and *Twiggs* both also make clear that the presumption of vindictiveness derives from "the timing of the prosecutor's actions," an objective factor, and not from the actual motive of the prosecutor. (*Bower*, *supra*, 38 Cal.3d at pp. 875, 878; *Twiggs*, *supra*, 34 Cal.3d at pp. 368, 372-373.) Citing the seminal opinions in *Blackledge v. Perry* (1974) 417 U.S. 21, 28 (*Perry*) and *North Carolina v. Pearce* (1969) 395 U.S. 711 (*Pearce*), our Supreme Court emphasized that courts "have consistently refused to attempt

to ascertain the subjective intent of the prosecutor." (*Bower*, at p. 878.) "[T]he lack of evidence that the prosecution acted maliciously or in bad faith" in increasing the severity of the offenses is unimportant, as "actual retaliatory motivation need not be shown. Rather, due process dictates that a defendant may not be deterred from exercising his constitutional right to attack his conviction by the possibility of prosecutorial retaliation." (*Twiggs*, at p. 369, citing *Perry*, at p. 27.) "[T]he mere appearance of vindictiveness is enough to place the burden on the prosecution.'" (*Twiggs*, at p. 371, quoting *United States v. Ruesga-Martinez* (9th Cir. 1976) 534 F.2d 1367, 1369.)

Moreover, "[t]he same considerations that led the high court to condemn such prosecutorial conduct in the context of a postconviction appeal are applicable when the defendant asserts his right to a retrial after a mistrial. As a prosecutor would have a considerable stake in discouraging appeals requiring trials de novo, so too would the prosecution in a case such as this have a great interest in discouraging defendant's assertion of a retrial, particularly since the prosecution was unable to obtain a conviction in the first trial. Here, the defendant has endured a trial and a mistrial due to a hung jury, and when he asserts his right to a jury retrial rather than plead guilty and accept a prison term, he is faced with the possibility of a greater punishment than he would have received if the prosecution had secured a conviction, apparently as a result of pursuing his right to be tried by a jury on retrial. Such a situation calls for invoking the prophylactic rule enunciated in *Perry* to protect against both the possibility that defendant will be deterred from exercising a legal right, as well as the danger that the state might be retaliating against the defendant for maintaining his innocence and facing a retrial." (*Twiggs*, *supra*, 34 Cal.3d at pp. 369-370.)

*Twiggs* also recognizes that the post *Perry* opinion of the United States Supreme Court in *Bordenkircher v. Hayes* (1978) 434 U.S. 357 (*Bordenkircher*) exempts from the presumption of vindictiveness prosecutorial threats of more severe charges that are made during pretrial plea negotiations. As we have said, the issue in this case turns heavily on whether the prospect of more serious charges was presented to appellant as part of a bargain proposed by the prosecution during pretrial negotiations.

The People's position in this appeal relies heavily on *Bordenkircher*, *supra*, 434 U.S. 357, which stands for the proposition that a prosecutor may carry out "a threat made during plea negotiations to reindict the accused on more serious charges if he does not plead guilty to the offense with which he was originally charged." (*Id.* at p. 358; accord, *United States v. Goodwin* (1982) 457 U.S. 368.) Hayes, the defendant in *Bordenkircher*, was charged with uttering a forged instrument, which was punishable by a term of 2 to 10 years in prison. After he was arraigned, his defense counsel met with the prosecutor who offered to recommend to the court a 5-year term if Hayes would plead guilty and also said that if Hayes did not he would seek an indictment under the habitual offender statute, which would subject Hayes to a

mandatory sentence of life imprisonment due to his two prior felony convictions.  Hayes chose not to plead guilty, and the prosecutor obtained an indictment under the habitual offender statute.  It was not disputed that the recidivist charge was fully justified by the evidence, that the prosecutor was in possession of this evidence at the time of the original indictment, and that Hayes' refusal to plead guilty to the original charge was what led to his indictment under the habitual offender law.  A jury found Hayes guilty on the charge of uttering a forged instrument and, in a separate proceeding, found that he had twice before been convicted of felonies.  As required by the habitual offender law, Hayes was sentenced to a life term in prison. (*Bordenkircher*, at pp. 358-359.)

The Kentucky Court of Appeals rejected Hayes' constitutional claims, finding that the prosecutor's decision to indict him as a habitual offender was a legitimate use of leverage in the plea bargaining process.  After a federal district court denied habeas corpus relief, the Sixth Circuit reversed, concluding that the prosecutor's conduct during the bargaining negotiations had violated the principles of *Perry*, *supra*, 417 U.S. 21. (*Bordenkircher*, *supra*, 434 U.S. at pp. 359-360.)  The Supreme Court reversed the Sixth Circuit.

As the high court explained, in cases such as *Pearce*, *supra*, 395 U.S. 711 and *Perry*, *supra*, 417 U.S. 21, "the Court was dealing with the State's unilateral imposition of a penalty upon a defendant who had chosen to exercise a legal right to attack his original conviction—a situation 'very different from the give-and-take negotiation common in plea bargaining between the prosecution and the defense, which arguably possess relatively equal bargaining power.' [Citation.]  The Court has emphasized that the due process violation in cases such as *Pearce* and *Perry* lay not in the possibility that a defendant might be deterred from the exercise of a legal right [citation], but rather in the danger that the State might be retaliating against the accused for lawfully attacking his conviction. [Citation.]  To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort [citation] and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional.' [Citation.]  But in the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." (*Bordenkircher*, *supra*, 434 U.S. at p. 363.)

The court pointed out that "[p]lea bargaining flows from 'the mutuality of advantage' to defendants and prosecutors, each with his own reasons for wanting to avoid trial.  [Citation.]  Defendants advised by competent counsel and protected by other procedural safeguards are presumptively capable of intelligent choice in response to prosecutorial persuasion, and unlikely to be driven to false self-condemnation.  [Citation.]  Indeed, acceptance of the basic legitimacy of plea bargaining necessarily implies rejection of any notion that a guilty plea is involuntary in a constitutional sense simply because it is the end result of the bargaining process.  By

hypothesis, the plea may have been induced by promises of a recommendation of a lenient sentence or a reduction of charges, and thus by fear of the possibility of a greater penalty upon conviction after a trial. [Citations.] [¶] While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable'—and permissible— 'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.' [Citation.] It follows that, by tolerating and encouraging the negotiation of pleas, this Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his right to plead not guilty." (*Bordenkircher*, at pp. 363-364; accord, *People v. Jurado* (2006) 38 Cal.4th 72, 98 ["It is not a constitutional violation . . . for a prosecutor . . . to threaten to increase the charges if the defendant does not plead guilty"].)

**The Contentions of the Parties**

Appellant argues that vindictive prosecution is shown by the fact that the prosecution both added the two new counts involving two new victims and alleged the prior convictions as strikes only after appellant exercised his right to a retrial after the prior trial resulted in a hung jury.

To establish that the prosecution did not act in retaliation for appellant's decision to exercise his right to a retrial, the Attorney General relies on the district attorney's declaration in support of his motion to amend, which the trial court impliedly credited.

As earlier noted, in that declaration, the prosecutor stressed the decision making that took place during the plea bargaining carried out in chambers on March 7, 2016.

The declaration stated that "[o]n or about March 7, 2016, I met in chambers with Solano County Superior Court Judge Robert Bowers and defense counsel," and had "specifically noted during these discussions that there were two additional victims that would justify additional charges against defendant or could be used in the pending trial under Evidence Code section 1108. [¶] I explained that at that point I would be proceeding without alleging additional counts relating to two other victims; however, the court and I urged counsel to resolve the case as charged because there were potential additional charges and multiple ways to achieve a life sentence against defendant given his priors and the two other victims. [¶] Because the plea negotiations in chambers were unsuccessful, I filed the Amended Information on July 6, 2016, alleging that defendant had suffered three prior strike offenses, which I believed left me the option of pursuing a life sentence if I chose. [¶] I proceeded to trial in case VCR223508 as charged in part because I believed that including the allegations in VCR227210 would present the jury with a more complex, difficult set of facts to unravel, especially since VCR223508 involved an independent, reliable eye witness that would allow me to avoid having a young child testify, whereas VCR227210 involved numerous other

instances of abuse with varying degrees of specificity.  [¶] Had I
included the charges from VCR227210 in the first trial, child
witnesses would have to testify and be subject to impeachment
[and], among other things, one of them had purportedly recanted,
and there would have been additional witnesses, thus complicating
the trial;" "[m]y decision was based . . . on my pre-trial negotiations
with [defense counsel] and my indication that I would seek the
additional charges and punishment should the case fail to resolve
before the first trial or should I fail to secure a conviction during the
first trial."

Agreeing with the prosecution that the challenged amendment was
sought by the prosecution as the result appellant's rejection of the
offer made to him on March 7, the court rejected the allegation of
vindictive prosecution.  The court stated its recollection of
discussing that appellant "was originally charged with one 288 with
a four-year-old child with a civilian witness.  [¶] The People had or
were developing some additional victims that they thought they
could charge.  And it was the court's sense or idea conveying to
both parties but specifically to the defense that if they could get out
of this with some sort of plea with some sort of number, perhaps
that would satisfy the People and they would not move forward on
the additional children.  [¶] . . . [¶] So now the People have at their
disposal the opportunity to use the law, the Evidence Code, to one,
either re-try him for the one kid and bringing in the other uncharged
acts of misconduct, or file those other cases, which the law, again,
allows them to be consolidated.  Same type of crimes.  Same
victims.  Same type of victims."

Appellant, who was at all times represented by competent counsel
who vigorously protected his interests, must be deemed to have
been fully informed of the consequences of rejecting the plea
bargain offered by the prosecutor on March 7, 2016.  On the one
hand, he knew his priors were not merely serious felonies but
qualified as strikes justifying the imposition of a life sentence,
which the Prosecutor explicitly indicated he might seek.  On the
other hand, appellant must also have known that, due to her age,
J.G. would probably be found incompetent to testify, and that the
videotaped interview of her was not inculpatory.  Given that the
"additional victims" the prosecutor said he might charge were
obviously A.G. and T.C., appellant's wife's grandchildren, and part
of his family, appellant knew this new evidence might be used to
support additional charges, but he must also have been aware of the
children's increasing unwillingness to testify against "Poppa Ray,"
or to do so effectively.[3]  Additionally, there were also signs that
Gulley, the principal prosecution witness of the offense involving
J.G., might be impeachable.

---

[3] [FN from opinion] We also observe that the possibility A.G. and T.C. would provide
new evidence justifying additional criminal charges was "an objective change in circumstances"
that "legitimately influenced the charging process" (*Bower, supra,* 38 Cal.3d at p. 879), but the
initial uncertainty whether those two children would testify against appellant justified the delay in
deciding whether to charge the offenses involving them until after the mistrial due to the hung
jury.

25

Nothing in the record indicates it would be unreasonable for us to assume, as we do, that, after weighing the competing considerations with the assistance of able counsel, appellant rejected the plea bargain offered by the prosecutor with full knowledge of the risk that eventually materialized: the imposition of a life sentence. (*See Bordenkircher*, *supra*, 434 U.S. at p. 360.)

Moreover, with respect to appellant's claim that the prosecution did not allege the prior convictions as strikes until the retrial, the record belies that assertion. As we have related, the original information alleged three prior serious felonies, without any allegation that would justify a life sentence. However, on June 3, 2016 (the day after the first jury was sworn), the prosecution filed a motion to amend the information to allege that the priors originally alleged pursuant to section 667, subdivisions (a)(1), (which also qualified as strikes) were additionally alleged as strikes pursuant to sections 667 subdivisions (b)-(i), and section 1170.12, subdivisions (a)-(d).

In support of this amendment, the prosecutor represented to the court that the omission of the prior strike enhancement allegation "appears to be an oversight since an enhancement [for a serious felony] based on that same prior was alleged in the [original] information. In any event, the defense should not be surprised by the prior given that defendant was on parole for it when the current case was filed. The defense also had defendant's RAP sheet (reflecting the prior conviction) since this case was filed over a year ago. The People's failure to add the strike actually benefitted the defendant since it allowed him to plea open to the court without having to suffer the additional penalty from the strike prior. And defendant will have time to contest the prior if it [sic] chooses. Finally, no other prior felony convictions have been charged, and the jury has not been discharged."

The court granted this unopposed motion to amend to add the prior strike enhancement allegation on July 6, 2016, well before declaring a mistrial due to the hung jury. Thus, appellant is simply mistaken in his claim that the prior strike enhancement was not alleged until after he exercised his right to a retrial.

The Attorney General's reliance on *Bordenkircher*, *supra*, 434 U.S. 357 is justified, as the circumstances of the case are similar to those here. As the Supreme Court said, while the prosecutor in *Bordenkircher* did not finally initiate the actions necessary to expose the defendant to the more severe sentence until after settlement discussions had ended, "his intention to do so was clearly expressed at the outset of the plea negotiations. [The defendant] was thus fully informed of the true terms of the offer when he made his decision to plead not guilty. This is not a situation, therefore, where the prosecutor without notice brought an additional and more serious charge after plea negotiations relating only to the original indictment had ended with the defendant's insistence on pleading not guilty." (*Id.* at p. 360.) Thus, as the *Bordenkircher* court stated, as a practical matter, "this case would be no different" if the People had charged appellant with the additional victims and priors necessary to produce a life sentence

"from the outset, and the prosecutor had offered to drop [those charges] as part of the plea bargain." (*Id.* at pp. 360-361.)

As our Supreme Court has reiterated, "[d]ue process does not prohibit the possibility of increased punishment in all cases of retrial after appeal" (or, it might also be said, after a hung jury), "'but only those that pose a realistic likelihood of "vindictiveness."'" (*Twiggs, supra,* 34 Cal.3d at p. 369, quoting *Perry, supra,* 417 U.S. at p. 27.) There is no vindictiveness where, as in both *Bordenkircher* and the present case, the prosecutor's intention to increase the severity of the charges "'was clearly expressed at the outset of the plea negotiations'" and the defendant "'was thus fully informed of the true terms of the offer when he made his decision to plead not guilty. (*Twiggs,* at p. 370, quoting *Bordenkircher, supra,* 434 U.S. at p. 360.) The fact that in this case the additional charges were added after a mistrial and before the subsequent retrial does not change the result, given that the prosecution had informed appellant of the possibility of such charges during plea negotiations that took place well before the prior trial ended in a mistrial. Thus, in this case, unlike *Twiggs,* the prosecutor did not "unilaterally impose[] a penalty *in response* to the defendant's insistence on facing a jury retrial" (*Twiggs,* at p. 371, italics added) because at the time of the offer appellant was not facing a retrial.

For the foregoing reasons, the addition of charges against two additional victims, along the lines described by the district attorney during the March 7, 2016 plea negotiations, did not give rise to a presumption of prosecutorial vindictiveness, and the granting of the People's motion effectuating that amendment did not constitute an abuse of judicial discretion. Likewise, appellant has not shown that the addition of the prior strike allegations—before the first mistrial—constituted prosecutorial vindictiveness.

ECF No. 18-7 at 113-29. The California Supreme Court denied petitioner's petition to review this issue. ECF No. 18-9 at 88.

Petitioner's vindictive prosecution claim should be denied. As noted, the AEDPA establishes a highly deferential standard for evaluating state court decisions. *Moses v. Payne,* 555 F.3d 742, 751 (9th Cir. 2009). A state court decision is contrary to federal law if the state court applies a rule that contradicts Supreme Court precedent or if the state court confronts an identical set of facts from those in a Supreme Court decision and nevertheless arrives at a different result than the Supreme Court. *Id.* A state court decision is an unreasonable application of federal law if the state court identifies the correct governing Supreme Court principle, but unreasonably applies that principle to the petitioner's set of facts. *Id.* For a decision to be an unreasonable

1  application of federal law, the state court's decision must be more than just "incorrect or

2  erroneous," it must be objectively unreasonable.  *Id.*

3          Supreme Court precedent is not clearly established for the purposes of habeas review if a

4  court has to modify a principle to apply it to a case.  *Id.* at 752.  As such, where no case gives a

5  clear answer to the question presented, it cannot be said that the state court unreasonably applied

6  clearly established federal law.  *Wright v. Van Patten*, 552 U.S. 120, 126 (2008).  Where a

7  Supreme Court decision does not squarely address the issue at hand or establish a legal principle

8  that clearly extends to a new context, it cannot be said that there is clearly established Supreme

9  Court precedent, and the court "must defer to the state court's decision."  *Moses*, 555 F.3d at 754.

10         Here, the state court reasonably applied Supreme Court precedent.  I have independently

11  reviewed the case law cited and relied upon by the state court, and the state court's opinion

12  accurately reflects the Supreme Court principles that applied to petitioner's claim.  The parties do

13  not cite, and I cannot find, a Supreme Court case analogous to petitioner's current set of facts—

14  where pretrial plea negotiations took place where an increase in charges was discussed, but that

15  increase did not occur until a mistrial occurred.  As such, it cannot be said that the state court

16  unreasonably applied clearly established federal law.  *See Wright*, 552 U.S. at 126.  In fact, the

17  state court conducted a thorough review of state and Supreme Court case law to reach its

18  conclusion, and I must defer to the state court's conclusion.  *Moses*, 555 F.3d at 754.

19  Accordingly, petitioner's prosecutorial vindictiveness claim should be denied.

20              **C.      Ineffective Assistance of Appellate Counsel**

21         Petitioner also argues that his appellate counsel performed ineffectively in raising the

22  vindictive prosecution claim in his direct appeal because counsel failed to address the prior

23  attachment of jeopardy which created the presumption of vindictiveness and failed to adequately

24  raise the issue under state constitutional precedents.  ECF No. 1 at 8, 136-42.  Petitioner raised

25  this claim in his state habeas petition, and the state court of appeal denied the claim:

26              **Appellate Counsel was not Ineffective in Briefing the**
                **Prosecutorial Vindictiveness Claim**

27

28              Thompkins's second claim of ineffective assistance of counsel is
                that appellate counsel Childs was ineffective for the way he briefed

the issue of vindictive prosecution to us.  The petition acknowledges that the claim "does not involve a complete failure to raise a vindictive prosecution claim but deficiencies in *how* appellate counsel presented that claim—specifically, his failure to address the independent protections of the California Constitution and the role of prior attachment of jeopardy in analysis of that claim."  And the traverse acknowledges that any success on the claim "depends almost entirely on the probable merits of the underlying claim."  We find no merit.

To begin with, Thompkins has not demonstrated that Mr. Childs's briefing on vindictive prosecution, following our request for further briefing, was unreasonable.  That briefing relied on the controlling state cases of *Twiggs*, *supra*, 34 Cal.3d 360 and *Bower*, *supra*, 38 Cal.3d 865 and argued: "Here, the defendant exercised his right to a trial—twice.  The first trial was aborted, after the attachment of jeopardy, because the prosecution failed to timely comply with its discovery obligations.  The second trial resulted in a mistrial as well, since (per defense counsel's report) the jury hung 10-2 for acquittal.  Only after the result of that trial did not please the prosecutor were new charges added, based on evidence the prosecutor had long possessed.  There can be no explanation for the prosecutor's decision to add new charges other than a vindictive motive, which must therefore be presumed."

Our opinion addressed the issue in a lengthy and detailed analysis rejecting the claim.  Doing so, we set forth the facts pertinent to the issue, many of which are recited above.  We then provided our "legal analysis" (*Thompkins*, *supra*, A152363 at p. 14), including the standard of review (*id.* at p. 13), and the relevant law (*id.* at p. 14), and from there went on to discuss at length both *Bower* and *Twiggs*.  (*Thompkins*, at p. 15.)  Then, following exposition of "the contentions of the parties" (*id.* at p. 19), we referred to, and quoted from, the prosecutor's declaration which "stressed the decision making that took place during the plea bargaining carried out in chambers on March 7, 2016."  (*Id.* at p. 20.)  After more discussion as to what occurred, we concluded that "[Thompkins], who was at all times represented by competent counsel who vigorously protected his interests, must be deemed to have been fully informed of the consequences of rejecting the plea bargain offered by the prosecutor on March 7, 2016."  (*Id.* at p. 12.)  And we went on to hold, "Nothing in the record indicates it would be unreasonable for us to assume, as we do, that, after weighing the competing considerations with the assistance of able counsel, appellant rejected the plea bargain offered by the prosecutor with full knowledge of the risk that eventually materialized: the imposition of a life sentence.  (*See Bordenkircher* [*v. Hayes* (1978)] 434 U.S. [357,] 360.)" (*Thompkins*, at p. 22.)7

Our opinion recognized that "The exception [to claims of prosecutorial vindictiveness] recognized in the federal case law for plea bargaining is also recognized in California."  (*In re Bower*, *supra*, 38 Cal.3d at p. 876.)  We also recognized that "[t]here is no vindictiveness where . . . the prosecutor's intention to increase the severity of the charges '"was clearly expressed at the outset of the

plea negotiations'" and the defendant "'was thus fully informed of the true terms of the offer when he made his decision to plead not guilty.'"'  (*Thompkins*, *supra*, A152363, at p. 23, quoting *Twiggs*, *supra*, 34 Cal.3d at p. 370; accord, *People v. Jurado* (2006) 38 Cal.4th 72, 98 ["It is not a constitutional violation . . . for a prosecutor . . . to threaten to increase the charges if the defendant does not plead guilty"].)

The opinion noted that during pretrial discussions, the prosecutor "urged counsel to resolve the case as charged because there were potential additional charges and multiple ways to achieve a life sentence against defendant given his priors and the two other victims."  (*Thompkins*, *supra*, A152363, at p. 20.)  And that the trial court corroborated and credited this assertion.  (*Id*. at pp. 20-21.)  Accordingly, given the parties' pretrial discussions, we concluded that neither the prosecutor's amendment to add the three-strikes enhancement nor its filing of the second case against defendant gave rise to a presumption of vindictiveness.  (*Thompkins*, at p. 24.)

Further, we held that *Twiggs* contradicted Thompkins's assertion that the plea-bargaining exception to claims of prosecutorial vindictiveness does not apply where the prosecution seeks to increase charges following either a mistrial or the swearing of a jury.  While *Twiggs* found that a presumption of vindictiveness arose where the prosecution sought to increase the charges following a mistrial (*Twiggs*, *supra*, 34 Cal.3d at pp. 364, 372), it specifically noted that "*Bordenkircher*[, *supra*, 434 U.S. 357] specifically did not decide the issue of vindictiveness presented in a case such as this, where the record suggests that the more serious charges were not part of the 'give-and-take' of plea negotiations.  Rather, in this case, the circumstances strongly suggest that the prosecutor unilaterally imposed a penalty in response to the defendant's insistence on facing a jury retrial."  (*Twiggs*, at p. 371.)  And in line with *Twiggs*, we rejected the argument that the timing of the prosecution's actions makes the plea-bargaining exception inapplicable: "The fact that in this case the additional charges were added after a mistrial and before the subsequent retrial does not change the result, given that the prosecut[or] had informed [defendant] of the possibility of such charges during plea negotiations that took place well before the prior trial ended in a mistrial.  Thus, in this case, unlike *Twiggs*, the prosecutor did not 'unilaterally impose[] a penalty *in response* to the defendant's insistence on facing a jury retrial' (*Twiggs*, at p. 371, italics added), because at the time of the offer [defendant] was not facing a retrial."  (*Thompkins*, *supra*, A152363, at pp. 23−24.)

Finally, we added that even if the presumption of vindictiveness applied, the prosecutor rebutted the presumption, concluding that: "the possibility [that the two additional victims] would provide new evidence justifying additional charges was 'an objective change in circumstances' that 'legitimately influenced the charging process' (*Bowker*, *supra*, 38 Cal.3d at p. 879), but the initial uncertainty whether those two children would testify against [defendant] justified the delay in deciding whether to charge the offenses involving them until after the mistrial due to the hung jury."

1     (*Thompkins*, *supra*, A152363, at p. 21, fn. 8.)  Given the established
    uncertainty about whether the new evidence would arise, the
2     prosecutor sufficiently rebutted the presumption of vindictiveness.

3     Those were the facts, and the factors, relied on by us in our opinion,
    a factual narration, we hasten to add, never challenged by
4     Thompkins, not in his petition for rehearing following our
    opinion—and perhaps most significantly of all, not in the 2021
5     declaration by trial counsel Carrington.

6     Were all that not enough, it must be recalled that after appellate
    counsel Childs withdrew from the case, FDAP itself filed a petition
7     for rehearing arguing that a presumption of prosecutorial
    vindictiveness is required under state constitutional grounds and
8     because jeopardy had attached—an argument similar, if not
    identical, to FDAP's current argument (although shorter).  Indeed,
9     Thompkins's own petition describes FDAP's petition for rehearing
    as raising a "request for reconsideration of this Court's rejection of
10     the vindictive prosecution claim in view of the independent state
    constitutional basis for the California Supreme Court's leading
11     cases and of the crucial role of the prior attachment of jeopardy
    under those authorities."  We rejected the argument and denied
12     rehearing.  Rearguing it here is no more successful.

13 ECF No. 18-11 at 256-60.  The California Supreme Court denied the petition to review this issue.

14 *Id.* at 264.

15     A "doubly" deferential standard governs a federal habeas petitioner's claim of ineffective

16 assistance of counsel.  *See Richter*, 562 U.S. at 105.  On direct appeal, the two-step inquiry from

17 *Strickland v. Washington* guides the analysis for an ineffective-assistance-of-counsel claim.  *See*

18 466 U.S. 668, 687 (1984).  First, a criminal defendant must show some deficient performance by

19 counsel that is "so serious that counsel was not functioning as the counsel guaranteed the

20 defendant by the Sixth Amendment."  *Id.*  Second, the defendant must show that the deficient

21 performance caused him prejudice, which requires "showing that counsel's errors were so serious

22 as to deprive [the petitioner] of a fair trial."  *Id.*  On habeas review, coupled with § 2254(d)'s

23 fairminded jurist standard, the *Strickland* requirements become even more deferential: the

24 question is "whether there is *any* reasonable argument that counsel satisfied *Strickland*'s

25 deferential standard."  *Richter*, 562 U.S. at 105 (emphasis added).  That is, if there is even one

26 reasonable argument that counsel did not violate the *Strickland* standard—even if the state court

27 has not identified such argument—the petitioner cannot obtain habeas relief.  *See id.* at 106.

28

1    Here, petitioner cannot demonstrate that he was prejudiced by his appellate counsel's

2    failure to make specific arguments related to the California constitution or jeopardy, because it

3    does not appear that making such arguments would have changed the outcome of the proceedings.

4    *See Fields v. Brown*, 503 F.3d 755, 776 (9th Cir. 2007) (noting that prejudice exists when there is

5    a reasonable probability that, but for counsel's error, the outcome of the proceedings would have

6    been different (citing *Strickland*, 466 U.S. at 694)).  As the state court explained, regardless of the

7    exact phrasing petitioner's appellate counsel used to raise the vindictive prosecution claim in his

8    direct appeal, the state appellate court went to great lengths to analyze the issue.  In fact, the state

9    appellate court analyzed the issue under state and Supreme Court precedent, and it analyzed the

10   issue of jeopardy attaching together with plea negotiations.  *See generally* ECF No. 18-7 at 113-

11   29.  As such, petitioner cannot demonstrate that his appellate counsel's failure to use specific

12   language in his direct appeal on the issue of prosecutorial vindictiveness prejudiced him, and this

13   claim should be denied.

14        **D.    Ineffective Assistance of Trial Counsel**

15   Finally, petitioner argues that his trial counsel performed ineffectively by failing to object

16   to Dr. Urquiza's testimony regarding the rarity of false molestation accusations.  ECF No. 1 at 10,

17   143-49.  Relying on the arguments made in his petition for review to the California Supreme

18   Court, he contends that his trial counsel's failure to raise legal arguments related to Dr. Urquiza's

19   testimony was deficient, and that he suffered prejudice as a result.  *Id.* at 144-49.  He argues that,

20   in *People v. Julian*, 246 Cal. Rptr. 3d 517 (Cal. Ct. App. 2019)—decided two years after his

21   conviction—a California appellate court found prejudicial ineffective assistance of counsel where

22   that defendant's trial counsel failed to object to Dr. Urquiza's testimony regarding the rarity of

23   false molestation allegations.  *Id.* at 144.  He argues that his trial counsel did not raise the issue

24   because she did not have a legal basis to raise the issue, but that the *Julian* decision belies his trial

25   counsel's assertion.  *Id.* at 144.

26   Petitioner raised this issue in his state habeas corpus petition, which the state court denied:

27

28

**The Claim of Ineffective Assistance of Trial Counsel Has No Merit**

Thompkins's first argument is directed to the conduct of trial counsel, Carrington who, in Thompkins's words, was ineffective for "allowing expert testimony on the rarity of false allegations of molestation and the frequency of recantation from child victims." The claim is based on how Carrington acted—perhaps more accurately, failed to act—in dealing with some testimony from Dr. Urquiza, the expert witness called by the prosecution. We thus begin with discussion of Dr. Urquiza's testimony.

Dr. Urquiza's testimony was fundamentally devoted to child sexual abuse accommodation syndrome (CSAAS), a theory that identifies behaviors of sexually abused children, testimony our Supreme Court has held "'is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301 (*McAlpin*).) CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, and the expert providing CSAAS testimony may not give "'general' testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused." (*People v. Bowker* (1988) 203 Cal.App.3d 385, 393 (*Bowker*).) Nor is it proper for an expert to present "predictive conclusions" (*ibid.*), such as alleged child abuse victim "should be believed," or "abused children give inconsistent accounts and are credible nonetheless." (*Id.* at p. 394.) In short, "The expert is not allowed to give an opinion on whether a witness is telling the truth . . . ." (*People v. Long* (2005) 126 Cal.App.4th 865, 871.)

Dr. Urquiza emphasized that CSAAS was an educational, not a diagnostic, tool: "the child sex abuse accommodation syndrome should not be used to make a determination as to whether a child is abused or not because it assumes a child has been abused. Its purpose is educational." He further explained, "In this case the purpose is to educate a jury so that they have good information about sexual abuse sort of as a foundation so that when they hear the evidence in this case, they may not be subject to any misperception or myths that they have previously held and would be able to render a better decision about guilt or innocence."

Dr. Urquiza explained that CSAAS is based on observational data, not experimental scientific studies. This is because "[y]ou cannot impose an experimental design where you assign people to go get abused and then later examine how they responded. . . . There is no research because you can't do that research." As such, the concept of an "error rate" is inapplicable.

Dr. Urquiza did not know about Thompkins's case, and had not read relevant investigative reports. And he went on to explain, "I'm not here to testify about any . . . specific aspect of this case. My position is . . . to testify about the research related to child sex

abuse, . . . to educate jurors about sexual abuse. Not to render any opinion about whether somebody is guilty or innocent of a crime or to say whether a particular child has been abused or not. That would be improper."

Dr. Urquiza testified that there are myths or misconceptions about the way that sexually abused children react or behave. One such misconception is that "[i]f a child has been sexually abused, they will tell right away." And, he explained, this misconception "fails to appreciate the context in which abuse occurs," including how sexually abused children are sometimes coerced, told to keep quiet, or threatened. Additionally, shame, embarrassment, confusion, or guilt may affect a child's "ability or willingness or comfort in talking about their own sexual victimization."

Then, and germane to the issue here, Dr. Urquiza testified that another misconception is that "[i]f you make a disclosure of sexual abuse and then you take it back, . . . you were never abused to begin with." Dr. Urquiza testified that recantations do not occur often, "[b]ut they do, in fact, happen. The best estimate we have is somewhere in the range of 20 to 25 percent of kids who have been abused at some point will take back the allegation of abuse." The specific testimony was this:

"Q. All right. What about a child denying the abuse? Or let me rephrase that. What about a child initially disclosing and then recanting, saying that it didn't happen?

"A. Okay.

"Q. Is that—are there myths or misconceptions associated with that?

"A. Well, the idea is if you are sexually abused and you disclose and then you take it back—or I'm sorry. Change this. If you make a disclosure of sexual abuse and then you take it back, the misperception is you were never abused to begin with.

"Q. Why is that a misconception?

"A. I think it's a misperception because people don't often understand the context of abuse and the reasons why a child would recant or take back the allegation. So if you understand what some of the context is with regard to sexual abuse and why a child would—and we have research to support this—why a child would take back the allegation, recant the allegation who actually had been sexually abused, then it's easier to understand.

"So you have to understand the context. You have to understand the underlying dynamics to see what some kids, given the correct situation, would take back, would recant the experience of being abused. Some kids who have been sexually abused take back the allegation of abuse.

"Q. Do recantations happen even though they were truthful, there was abuse actually happening?

"A. Well, yeah, that's the issue. The issue is—a recantation is you have been abused, and at some point after you disclose, you take back the allegation. Now, do they happen often? No. But they do, in fact, happen. The best estimate we have is somewhere in the range of 20 to 25 percent of kids who have been abused at some point will take back the allegation of abuse.

"Q. All right. So the misconception in the public is that if there is a recantation, it means it didn't happen?

"A. Correct."

Dr. Urquiza testified that CSAAS details the "kinds of behaviors that we tend to see together that comprise the context of [child sexual] abuse and children's responses" to that abuse, going on to describe five possible characteristics or behaviors associated with child victims of sexual abuse: secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction or recantation. And later on direct examination Dr. Urquiza was asked this:

"Q. The last factor, the fifth factor: retraction?

"A. Yes.

"Q. I know we kind of touched on that when I was going over myths and misconceptions. Tell me about how that plays a factor in sexual abuse accommodation syndrome.

"A. Well, understanding that, one, we are talking about kids who have been abused, and understanding that it's a really difficult thing to be able to make a disclosure of abuse, that's a hard thing to do to begin with, but if you make a disclosure and there is no support for you as a child, if your mom or dad or somebody tells you, 'No. Don't say that. Take that back,' then those are the kinds of things that undermine that child's ability to make—to sustain that disclosure. [¶] And so the best research that we have at the moment is that roughly, what I said earlier, 20 to 25 percent of kids who have been abused and are able to make a disclosure take back that allegation of abuse, usually because of some type of family pressure imposed upon them."

Direct examination of Dr. Urquiza ended on, 28 pages in all, and defense counsel Carrington began her cross-examination. Following some preliminary questions, she leadingly asked, your "information doesn't necessarily apply to this case at all," to which Dr. Urquiza replied, "I'm not here to testify about any aspect, specific aspect of this case." Ms. Carrington then spent several pages inquiring into Dr. Urquiza's background, his current practice, his publications and his teaching. She then turned to the "five elements" he had mentioned, beginning with "secrecy," where this exchange took place:

"Q. Okay.  All right.  So you're saying that it should not—it's inappropriate for the child sexual accommodation syndrome to be used as a tool to determine whether or not a child has been sexually abused?

"A. Yes.  And I believe he would agree with me.

"THE COURT: Let the record reflect the Judge nodding his head vigorously up and down."

The cross-examination then turned to "delay in disclosure," where Ms. Carrington spent several pages confronting Dr. Urquiza with various journals and particularly the work of one Dr. Summit, which examination ended with this exchange:

"Q. Okay.  So what scientific data did he present to show that adults had these common myths?

"A. I don't believe he did in his 1983 article.

"Q. Okay.  Now, you mentioned the recantation.  You said there is approximately 20 to 25 percent of children who have actually been abused that recant?

"A. Correct.

"Q. And so there are 75 to 80 percent of children that recant who were actually not abused?

"A. No.  There are other kids who have been abused that didn't recant.

"Q. Okay.  All right.  So how do you—how do you quantify the kids—or can you quantify the kids that recant and actually weren't abused?

"A. You mean—are you going to the land of false allegations?

"Q. Yes.

"A. Whenever anybody asks me about false allegations in sexual abuse, I have a caveat that I usually start with which is: it's hard to do research on kids.  It's hard to do research on sexual abuse with kids—with sexual abuse on kids.  And I think it's even harder to do research on false allegations of sexual abuse.

"Now, there is a body of research.  It's not huge, but there is a body of research on false allegations.  I am glad to talk with you about it. But basically it does happen.  It does not happen very frequently.  I usually use the term it happens very infrequently or rarely.  But it does happen that sometimes kids who have not been abused will say that they were sexually abused."

Two pages later the examination ended.

36

In support of his first argument that trial counsel Carrington was ineffective for not objecting to Dr. Urquiza's testimony, Thompkins provided a declaration from her, where she testified in part as follows: "My defense theory of the case was that the alleged victims in this case, T.C. and A.G., had not been purposely dishonest, but that they had been unduly influenced. There was a high level of suggestibility from the MDIC interviewer (Vicky Rister, the investigator from the District Attorney's Office) and CWS (Wendy Smith, the CWS social worker). The two girls were essentially saying what they thought the interviewers and the social worker wanted them to say. In support of that line of defense, I called Dr. William O'Donahue who described how children can form 'false memories' of abuse based on suggestive questioning during an interview.

". . . The two girls here had either recanted their prior out-of-court allegations of molestation or had refused to confirm or repeat those claims in court. Consequently, Dr. Urquiza's testimony that a high proportion of actual child sexual abuse victims (20 to 25%) recant truthful allegations of abuse was definitely not helpful to the defense. Similarly, his assertion that scientific research has established that false allegations of such abuse occur 'very infrequently or rarely' was damaging to the defense.

". . . I did not have any tactical reasons for allowing those portions of Dr. Urquiza's testimony to go before the jury. I would have preferred to have that testimony excluded or stricken. I had reviewed Dr. Urquiza's testimony in two prior trials in which he had made similar assertions regarding the rarity or very low percentage of false allegations of abuse. However, at the time of the *Thompkins* trial, I was not aware of any legal basis for seeking exclusion of that testimony. If I had been aware of such grounds, I would have objected or have asked the court to strike those portions of Dr. Urquiza's testimony.

". . . I first became aware of the legal basis for excluding such expert testimony in July or August 2019, when I received a service copy of the Second Petition for Rehearing in Mr. Thompkins's appeal, A152363."

The Director responds that Thompkins has submitted no expert "criminal defense" testimony as to what trial counsel should have done. Thompkins replies with this: "We have presented something better tha[n] the opinion of 'a criminal defense expert.' *Published judicial opinions*, including one from this Court, have expressly held that there could not have been a reasonable ground for foregoing objection to expert testimony on the putative rarity of false molestation allegations or to similar probabilistic testimony beyond the proper bounds of CSAAS. 'There is no justification for counsel's failure to object to Urquiza's statistical evidence on false allegations.' ([*People v.*] *Julian* [(2019)] 34 Cal.App.5th [878,] 888 [(*Julian*)]; see Pet. 45 for further discussion.)"

The "published judicial opinions" are *People v. Wilson* (2019) 33 Cal.App.5th 559 (*Wilson*); *Julian*, *supra*, 34 Cal.App.5th 878;

1    *People v. Lapenias* (2021) 67 Cal.App.5th 162 (*Lapenias*); and
     *People v. Clotfelter* (2021) 65 Cal.App.5th 30 (*Clotfelter*), the last
2    case being the "one from this Court." We discuss them in order.

3    On March 27, 2019, our colleagues in Division Four filed *Wilson*, a
     prosecution for 12 counts of lewd conduct against the daughter of
4    Wilson's live-in girlfriend, in which Dr. Urquiza testified as to the
     infrequency of false allegations of child sexual abuse. Surveying
5    numerous cases nationally, both state and federal, our colleagues
     held that such testimony invaded the province of the jury, saying
6    this: "Dr. Urquiza's testimony had the effect of telling the jury there
     was at least a 94 percent chance that any given child who claimed
7    to have been sexually abused was telling the truth. And, although
     Dr. Urquiza's testimony on this point was not expressly directed to
8    either L.D. or J.D., the practical result was to suggest to the jury
     that there was an overwhelming likelihood their testimony was
9    truthful. In doing so, this testimony invaded the province of the
     jury, whose responsibility it is to 'draw the ultimate inferences from
10   the evidence.' [Citations.]" (*Wilson*, *supra*, 33 Cal.App.5th at pp.
     570−571.) Our colleagues went on to find the admission of the
11   evidence not prejudicial, as defendant there—as did Thompkins
     here—had called his own expert in rebuttal. (*Wilson*, at p. 572.)

12
     *Julian*, an opinion by Division Six of the Second Appellate District
13   filed a month after *Wilson*, involved a prosecution for four counts
     of lewd acts upon a child and one count of sexual penetration with a
14   child under 10. Dr. Urquiza testified about CSAAS theory.
     (*Julian*, *supra*, 34 Cal.App.5th at pp. 882−883.) The Court of
15   Appeal described what happened next:

16   "After presenting CSAAS evidence, the People introduced a new
     issue— the statistical percentage of false allegations by child sexual
17   abuse victims. Urquiza testified false allegations by children 'don't
     happen very often.' '*The range of false allegations that are known*
18   *to law enforcement or [Child Protective Services] . . . is about as*
     *low as one percent of cases to a high of maybe, six, seven, eight*
19   *percent of cases that appear to be false allegations.*' (Italics
     added.) Julian's trial counsel did not object to this testimony. [¶]
20   Urquiza testified one study showed that of the [four] percent of
     cases where there are false allegations, the 'largest subgroup'
21   involved 'some type [of] custodial dispute.' He also said that
     research bears out that false allegations are '*very infrequent, or*
22   *rare.*' (Italics added.)" (*Julian*, *supra*, 34 Cal.App.5th at p. 883.)

23   Citing many of the same authorities as in *Wilson*, the Court of
     Appeal held that "[t]his statistical probability evidence deprived
24   Julian of his right to a fair trial." (*Julian*, *supra*, 34 Cal.App.5th at
     p. 886.) In particular, citing to *Snowden v. Singletary* (11th Cir.
25   1998) 135 F.3d 732, the Court said: "At trial [in *Snowden*] an
     expert witness testified that 'child witnesses in sexual abuse cases
26   tell the truth' 99.5 percent of the time. [Citation.] The court said,
     'That such evidence is improper, in both state and federal trials, can
27   hardly be disputed.' [Citation.] 'The jury's opinion on truthfulness
     of the children's stories went to the heart of the case.' [Citation.]
28   'Witness credibility is the sole province of the jury.' [Citation.]

Allowing this expert testimony to 'boost the credibility of the main witness against [the defendant]' resulted in a 'fundamentally unfair' trial. [Citation.]" (*Julian*, at p. 886.)

The Court of Appeal went on to hold that by failing to object to such testimony, trial counsel provided ineffective assistance, as there was no justification for the failure to object. And, the court concluded, the errors were prejudicial under any standard, and reversed and remanded for a new trial given the circumstances there—circumstances the Court of Appeal described in detail:

"Urquiza used that opportunity to repeatedly reassert his claim that statistics show children do not lie about being abused. [Julian's] counsel's questions about multiple studies only opened the door to a mountain of prejudicial statistical data that fortified the prosecutor's claim about a statistical certainty that defendants are guilty. (*In re Jones* (1996) 13 Cal.4th 552, 571.)

"Moreover, in closing argument, the prosecutor asked the jury to rely on Urquiza's statistical evidence that 'children rarely falsify allegations of sexual abuse.' He reminded jurors that Urquiza 'quoted a Canadian study for over 700 cases, *not a single one where there was a false allegation*.' (Italics added.) The claim that there is a zero percent chance children will fabricate abuse claims replaced the presumption of innocence with a presumption of guilt.

"In his closing argument, Julian's counsel discussed his position regarding Urquiza's testimony about the '12 studies,' the Canadian study, the Trocme & Bala study, a social worker study showing 'four percent or five percent' as false allegations, and the prosecutor's claim that 'false allegations are very rare.' When he discussed the statistical percentage of false allegations in a study called 'false allegations of sexual abuse of children and adolescents,' the prosecutor object ted. The court stopped the argument for a 15-minute recess. When the jury returned, the court instructed jurors that there was 'a disagreement' by counsel about 'a certain study.' The jury should decide the issue based on the evidence introduced about the study, not what the lawyers remember about it. Consequently, the jurors' attention was directed, once again, to the statistical study evidence right before they began their deliberations." (*Julian*, *supra*, 34 Cal.App.5th at pp. 888−889.)

On July 29, 2021, the Fourth Appellate District filed *Lapenias*, *supra*, 67 Cal.App.5th at page 177, where defendant was convicted of six offenses against his stepdaughter. There, while CSAAS expert Dr. Blake Carmichael was testifying, a juror asked, "is it common for children to make up a story that abuse occurred, when, in fact, it did not?" Lapenias's counsel objected to the question, but the court allowed it, and the expert testified "no, that's rare." (*Ibid.*) As relevant here, the Court of Appeal held that: (1) the trial court properly admitted CSAAS evidence, and (2) although the court erred by allowing the Dr. Carmichael to testify that it is "rare" for children to make up stories about sexual abuse, the error was not prejudicial, as the testimony was brief, and the victim's

39

contemporaneous disclosures to a close friend about being molested by defendant provided corroborative evidence of his guilt.  (*Id.* at pp. 179-181.)

Our recent opinion in *Clotfelter* involved a prosecution for violating section 647.6, and we held there was no substantial evidence that Clotfelter engaged in conduct objectively irritating or disturbing under that section.  (See *Clotfelter*, *supra*, 65 Cal.App.5th at pp. 52–53.)  As to the CSAAS testimony involved there, it had nothing to do with recantation.  (*Id.* at p. 64.)  Moreover, we held—as the Attorney General conceded—that the expert misused the CSAAS testimony to suggest that the victims had actually been abused.  (See *ibid.*)  Indeed, *Clotfelter* involved so many instances of improper trial conduct that we took the unusual step of reminding trial judges presiding over criminal cases of their independent responsibility in the conduct of such trials.  (See *id.* at p. 69, fn. 11.)

That, then, is the setting in which we review Thompkins's claim of ineffective assistance of trial counsel.  And conclude it has no merit—for several reasons.

First, it must be recalled that the trial here was in April 2017, two years before the first of the cases Thompkins cites in claimed support of the law that supposedly supports him.  So, even assuming that the cases support his position, such law cannot be relied on to support a claim of ineffective assistance two years earlier.  As noted, counsel is not incompetent for failing to anticipate a change in law: "the constitutional standard for effective assistance of counsel has never required . . . prescience."  (*People v. Dennis*, *supra*, 17 Cal.4th at p. 537; *People v. Turner*, *supra*, 50 Cal.3d at p. 703.)

Indeed, if one would look for the law as of 2017, when the trial took place, one would find *People v. Housley* (1992) 6 Cal.App.4th 947, 954-956 (*Housley*), a decision by this court, which held that testimony of recantation is admissible to "dispel certain common misconceptions regarding the behavior of abuse victims."  There, the victim recanted her previously-asserted claim that her grandfather had sexually molested her when she was a child.  (*Id.* at p. 951.)  A prosecution expert testified that "it is very common for victims of abuse to recant the story after first making a report because they may not be believed, or may be removed from their home, or may fear the offender will suffer negative consequences from the reported abuse."  (*Id.* at p. 952.)  As we described it, appellant argued it was "error to allow the doctor to testify that victims commonly and falsely recant their stories of abuse."  (*Id.* at p. 954.)

We rejected defendant's challenge to the introduction of such testimony, holding that it neither constituted an improper opinion as to the victim's credibility nor improperly suggested that the molestations had actually taken place, as the expert had made clear—just as here—that she had never met the victim, was unfamiliar with the details of the case, and had never read any reports associated with the matter.  (*Housley*, *supra*, 6 Cal.App.4th

at pp. 954-955.)  And we concluded, "[i]t is . . . unlikely the jury would interpret [the expert's] statements as a testimonial to [the victim's] credibility."  (*Id.* at pp. 955−956.)[4]

A similar case is *People v. Bowker*, *supra*, 203 Cal.App.3d at page 394, where the Court of Appeal held that "Where an alleged victim recants his story in whole or in part, a psychologist could testify on the basis of past research that such behavior is not an uncommon response for an abused child who is seeking to remove himself or herself from the pressure created by police investigations and subsequent court proceedings."

Second, the cases on which Thompkins relies did not involve the testimony about which he fundamentally complains here—recantation.

And third, even if there were error—which Thompkins has not demonstrated—his claim would fail for lack of his ability to prove prejudice, just as in *Wilson* and *Lapenias*.  Only *Julian* held the error was prejudicial, and Thompkins points to *Julian* which he describes as "squarely on point."  Hardly.  The circumstances here are a far cry.

The extensive focus on Dr. Urquiza's testimony in *Julian*, in both the case in chief and the closing arguments, was described by the Court of Appeal in detail, as noted above.  There is no comparable focus here.  The sum of Dr. Urquiza's challenged testimony here comprises a tiny part of his 51 pages of testimony, explains that it is very hard to conduct research of child sexual abuse and even more difficult to conduct research on false allegations, and provides that the body of research is "not huge" on this topic but suggests that false allegations do occur, albeit rarely or very infrequently.  Dr. Urquiza did not further expound on the topic, provide statistical data, or discuss specific studies or their findings, as he did in *Julian* or *Wilson*.  In short, Thompkins has not demonstrated that the outcome of the trial would have been more favorable had counsel objected to Dr. Urquiza's brief testimony.  There are several reasons why.

First, Dr. Urquiza's testimony included a warning that it was difficult to conduct research with children alleging sexual abuse,

---

4 [FN in opinion] Our Supreme Court has since cited *Housley* with approval in finding similar testimony appropriate in the context of domestic violence.  (*People v. Brown* (2004) 33 Cal.4th 892, 906-908.)  There, the victim recanted her previously-asserted claim that her boyfriend had assaulted her.  (*Id.* at pp. 896-897.)  A prosecution expert testified that "[a]bout 80 to 85 percent of victims [of domestic violence] 'actually recant at some point in the process,'" with some saying, "they lied to the police" while "almost all will attempt to minimize their experience."  (*Id.* at p. 897.)  The Supreme Court concluded there was an adequate foundation for the expert testimony and such testimony was admissible to dispel the misconception that, "when the victim's trial testimony supports the defendant or minimizes the violence of his actions, . . . if there really had been abusive behavior, the victim would not be testifying in the defendant's favor."  (*Id.* at pp. 906-907.)

and even more difficult to conduct research on false allegations of child sexual abuse, thereby limiting the impact of his testimony. Second, he explained that the "research" was "not huge," further minimizing the impact of that testimony to the jury. Third, the challenged testimony was brief. Fourth, Dr. Urquiza made it clear he knew nothing about the specific case or allegations and could not render an opinion as to guilt or innocence of a crime or whether a particular child has been abused. And fifth, Dr. Urquiza repeatedly emphasized his testimony was purely educational: "[T]he purpose is to educate a jury so that they have good information about sexual abuse sort of as a foundation so that when they hear the evidence in this case, they may not be subject to any misperception or myths that they may have previously held and would be able to render a better decision about guilt or innocence." Thus, the challenged testimony was simply not likely to prejudice defendant in light of the overall evidentiary presentation.

Moreover, and unlike the prosecutor in *Julian*, in closing argument the prosecutor did not focus on Dr. Urquiza's testimony, focusing on A.G. and T.C.'s videotaped interviews, dispelling any suggestion that the children's statements were the product of suggestibility rather than actual abuse. He also discussed the charge regarding J.G. and the percipient witness's testimony as to that incident. Indeed, the prosecutor referred to Dr. Urquiza only three times during his opening argument. First, in discussing one of the girls' videotaped interviews, the prosecutor reminded the jury that "you have to put in this context of a child reporting an incident of sexual abuse. Dr. Urquiza . . . tried to help walk you through this, about why a child might have difficulty remembering details, might have a delayed report, might have discomfort talking about it." Second, after referencing how T.C. could "barely get through the door" to testify and ultimately denied the abuse, the prosecutor explained, "Dr. Urquiza explained that that happens. Of course that happens. This is not something that kids want to talk about." And, finally, after discussing J.G.'s abnormal behavior while in foster care, the prosecution explained it with reference to Dr. Urquiza.[5]

---

[5] [FN from opinion] "Dr. Urquiza was the expert that we had testify about child sexual abuse accommodation syndrome and to help get rid of some of the myths associated with child sexual abuse. Dr. Urquiza, as we covered many, many times, was not here to prove that sexual abuse occurred. His role is to try to bring jurors back to neutral.

"He is trying to bring you back to zero so that you can objectively evaluate the evidence. That was his role. Because jurors often come in with these myths that just aren't true about, 'Well, kids are abused, and they run and report it right away.' Well, that's not true. Science says that that is not how it works.

"Or that children will have these photographic memories about what happened. That's not true, either. False reports are not common. And, in fact, a child recanting, a child saying, 'No, it didn't happen,' after the investigation starts and they've got to talk to police, people are questioning them, of course they are going to think, 'Oh my god. Did I set off something? Am I in trouble? Am I responsible?'

The prosecutor spent the remainder of his argument discussing defense expert testimony, admonishing the jury not to speculate on things not in evidence, explaining the date range for the charges, and reviewing the burden of proof. And he concluded, "Tie every decision to the evidence, and you will be able to reach a reasonable conclusion in this case."

Defense counsel Carrington argued that the percipient witnesses were inconsistent, provided uncorroborated testimony, and that A.G.'s and T.C.'s accusations against Thompkins were the product of suggestive interviews. Defense counsel referred to Dr. Urquiza only briefly, reminding the jurors that Dr. Urquiza said it would be "inappropriate" for the jury to use CSAAS to determine whether or not a child has been molested, arguing that, "And you are here to determine that. So that gets you nowhere. That neither adds nor takes away from your ability to decide this case."

The prosecutor referred to Dr. Urquiza only once during rebuttal, however passingly, where, referring to defense counsel's theory, said this: "Everybody is lying. Kenneth Boyd is lying. Tara Gulley is lying. Wendy Smith is lying. Dr. Urquiza isn't truthful with you about what the real science is about."

Prejudice was further avoided by the testimony of defense expert O'Donahue, who testified that "25 percent of adults can . . . be suggested, can form false memories," and research showed "similar sorts of effects [with children] but much higher rates." He further testified that young children of three to five years old can form "false memor[ies]" based on the type of questioning performed during an interview, explaining that there are "18 criteria that a good interview ought to have," and a problem may arise if one of the criteria is absent. In this way, Dr. O'Donahue's testimony reinforced the notion that false memories—and thus false allegations—occur.

Also bearing on the lack of prejudice is that the trial court instructed that Dr. Urquiza's testimony could not be used as evidence that Thompkins committed any of the crimes charged, that the jury alone must judge the credibility or believability of the witnesses. It is presumed that the jurors followed these instructions. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 202.)

Finally, there are the videotaped interviews of A.G. and T.C., where the two girls chronicled their abuse with detailed—and compelling—evidence that provided the jury with ample opportunity to judge the credibility of both girls based on a variety of factors including demeanor, body language, tone of voice, word choice, descriptions of the abuse, and their various interactions with the interviewer. And after relatively brief deliberations, the jury

---

"And, again, the easy way, like [T.C.] is saying, 'If I just say no, I don't get questioned. I don't have to do this anymore.' And Dr. Urquiza, he makes his living off of studying this. And contrary to Dr. O'Donahue, Dr. Urquiza didn't know a thing about this case."

1

2

3

> reached its verdict, in which it convicted on two counts and acquitted on one other, a verdict that shows the jury thoughtfully and properly relied on the case and the truthfulness of the allegations—not the expert witness.

4   ECF No. 18-11 at 239-56.  The California Supreme Court denied the petition to review this issue.

5   *Id.* at 264.

6        Petitioner's ineffective assistance of counsel claim should be denied.  An ineffective

7   assistance of counsel claim cannot be predicated on counsel's failure to anticipate a change in the

8   law, *United States v. Juliano*, 12 F.4th 937, 940 (9th Cir. 2021), because counsel's actions must

9   be evaluated from counsel's perspective at the time of trial, *Strickland*, 466 U.S. at 689.  Courts

10  must refrain from viewing an attorney's "decisions in the distorting effects of hindsight."

11  *Juliano*, 12 F.4th at 940 (quoting *Torres-Chavez v. Holder*, 567 F.3d 1096, 1101 (9th Cir. 2009)).

12  Here, petitioner's claim hinges on hindsight; he asks the court to take 2019 law and apply it to his

13  2017 trial.  However, his trial counsel cannot be deemed deficient for failing to anticipate a

14  change in the law, *see id.*, and according to his trial counsel and the state court, the law at the time

15  supported the use of Dr. Urquiza's testimony, *see* ECF No. 18-11 at 245-55.  Because petitioner

16  cannot demonstrate his counsel performed deficiently, his ineffective assistance of trial counsel

17  claim should be denied.

18       Accordingly, it is hereby RECOMMENDED that:

19       1.      The petition, ECF No. 1, be DENIED;

20       2.      The court decline to issue the certificate of appealability referenced in 28 U.S.C.

21  § 2253; and

22       3.      The Clerk of Court be directed to close this case and to enter judgment

23  accordingly.

24       These findings and recommendations are submitted to the United States District Judge

25  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days of

26  service of these findings and recommendations, any party may file written objections with the

27  court and serve a copy on all parties.  Any such document should be captioned "Objections to

28

1  Magistrate Judge's Findings and Recommendations," and any response shall be served and filed

2  within fourteen days of service of the objections.  The parties are advised that failure to file

3  objections within the specified time may waive the right to appeal the District Court's order.  *See*

4  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

5  1991).

6

7  IT IS SO ORDERED.

8

9  Dated:    May 14, 2025

                                              JEREMY D. PETERSON
10                                            UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28